# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF VIRGINIA
### CHARLOTTESVILLE DIVISION

|  |  |
|---|---|
| WEIHUA HUANG, | CASE NO. 3:11-cv-00050 |
| *Plaintiff,* |  |
| v. | MEMORANDUM OPINION |
| THE RECTOR AND VISITORS OF THE UNIVERSITY OF VIRGINIA, ET AL., | JUDGE NORMAN K. MOON |
| *Defendants.* |  |

This action arises out of the employment relationship between Defendant Rector and Visitors of the University of Virginia ("UVa") and Plaintiff Weihua Huang ("Dr. Huang"). Dr. Huang originally filed his complaint in this matter on August 3, 2011 (docket no. 1). On October 7, 2011, Defendants filed a motion to dismiss (docket no. 3). After securing the consent of both Defendants and the Court, Dr. Huang filed an amended complaint on November 4, 2011 (docket no. 19). The purpose of the amended complaint was to clarify against whom the various counts contained within the complaint were asserted, and to add an additional count. This matter is now before the Court on Defendants' amended motion to dismiss, which was filed on November 18, 2011 (docket no. 20). For the reasons that follow, I will grant in part and deny in part Defendants' motion.

## I.  Background

The factual allegations of the amended complaint, which the Court must accept as true, are as follows. In 1999, Dr. Huang began a post-doctoral fellowship at the University of Tennessee in the Department of Pharmacology. While there, Defendant Ming Li ("Dr. Li") was assigned as Dr. Huang's "supervisor and mentor." In 2005, both Dr. Huang and Dr. Li

transferred to UVa and began working there in the Department of Psychiatry and Neurobehavioral Sciences under its chairman, Defendant Bankole Johnson ("Dr. Johnson"). In 2007, Dr. Huang was promoted from research associate to assistant professor. Following this promotion, Dr. Huang made attempts to become an independent researcher so that he might conduct his own self-guided research. In 2008, Dr. Huang applied for a National Institutes of Health ("NIH") grant to fund a proposed research project called "Functional Characterization of ANKK1 and its Genetic Variants" (the "ANKK1 project"). Dr. Huang secured the approval of Dr. Li and Dr. Johnson, and NIH eventually approved the project for a period from June 15, 2009 through February 28, 2011. For the ANKK1 project, Dr. Huang was to serve as the sole "principal investigator" or "PI." Dr. Huang proposed to allocate fifty percent (50%) of his time, referred to as level of effort, to the ANKK1 project, and listed Dr. Li's supervisory effort as five percent (5%) of effort.[1]

On or about September 4, 2009, approximately three months after the commencement of the ANKK1 project, Dr. Huang contacted Dr. Johnson to express his concern that he had not been receiving monthly status reports for the project, and that perhaps someone else might have taken over control of the grant account. On or about September 29, 2009, Dr. Huang finally received from Dr. Li the monthly status reports for July and August 2009. According to Dr. Huang, Dr. Li had changed the levels of effort charged to the ANKK1 project without Dr. Huang's authorization. Specifically, Dr. Li had assigned fifty percent (50%) of the time of lab technician Nicole Gautier ("Ms. Gautier") to the ANKK1 project, had increased his own level from five to seven and a half percent (7.5%), and had increased Dr. Huang's level of effort from fifty to seventy-five percent (75%). These changes did not, according to Dr. Huang, reflect the

---

[1] The level of effort a researcher allocates to a particular project determines the percentage of the researcher's salary that can be withdrawn from that project's fund account.

2

work that was actually being conducted on the ANKK1 project (particularly since Ms. Gautier had not worked on the project at all). Moreover, the alterations would allow Dr. Li to devote his and Ms. Gautier's time to other research projects, but draw money from the ANKK1 project to pay unrelated salaries and expenses. Further, these changes were unauthorized; Dr. Huang was the principal investigator with "responsibility to allocate, alter, and approve any level of effort charged to the project account," and yet he had not approved the changes. Am. Compl. ¶ 38.

In light of his belief that Dr. Li's actions represented a misappropriation of funds in violation of the False Claims Act, Dr. Huang reported the unauthorized modifications to Dr. Johnson and Gregory Benham ("Mr. Benham"), the Chief Operating Officer of the Department, on or about October 12, 2009. Although they did not acknowledge that Dr. Li's actions were inappropriate or unlawful, Dr. Johnson and Mr. Benham assured Dr. Huang that the changes would be readjusted and any money that had been withdrawn would be refunded. According to Dr. Huang, throughout the remainder of his employment with UVa, the withdrawn money was never refunded.

On or about November 20, 2009, Dr. Huang received a notice of nonrenewal from Dr. Johnson and Dr. Li, informing him that UVa would not be renewing his employment contract, which was set to expire one year later in November 2010. The notice stated: "This intended decision is based upon the development of serious issues concerning your professional relationships with your supervisor, Dr. Li. These issues have negatively impacted Dr. Li's assessment of your performance in your position." Am. Compl. ¶ 45. The notice of nonrenewal was also accompanied by restrictive conditions on Dr. Huang's employment.[2] According to Dr. Huang, these restrictions effectively breached Defendants' commitment to NIH to provide him

---

[2] According to Defendants, the notice of nonrenewal was also accompanied by specific performance expectations designed to make the remaining year productive. Mem. Supp. Defs.' Mot. Dismiss 2.

featured resources and adequate space.  For example, in or about December 2009, new locks were placed on Dr. Li's laboratory, preventing Dr. Huang from accessing equipment and facilities necessary for conducting research under the ANKK1 grant.  Additionally, Dr. Huang was not provided with sufficient alternative space, facilities, or equipment, thus hampering his research.

On or about February 18, 2010, NIH notified Dr. Huang that it was extending grant funding for the ANKK1 project through February 2011.  At the same time, Dr. Huang was informed that he was facing possible disciplinary actions up to and including termination as a result of his lack of compliance with the notice of nonrenewal.  In response, Dr. Huang filed a grievance with the Faculty Senate Grievance Committee ("FSGC").  Dr. Huang reported the aforementioned facts to the FSGC, requested that Dr. Li's conduct be investigated, and sought a guarantee of no further retaliation.  The FSGC accepted Dr. Huang's grievance on or about March 23, 2010.

However, on or about May 14, 2010, Sharon Hostler ("Dr. Hostler"), the Senior Associate Dean of the School of Medicine, gave Dr. Huang written notification that he would be placed on administrative leave with pay, effective immediately.  In addition to reiterating the claims of noncompliance with the notice of nonrenewal, the notification of suspension included further accusations that Dr. Huang had taken Dr. Li's equipment without permission and that Dr. Huang had attempted to pass off Dr. Li's data as his own.  Dr. Huang denied these claims.  On or about June 13, 2010, Dr. Huang filed a formal compliance complaint with the Corporate Compliance & Privacy Office.  In response, Dr. Hostler recommended to the Provost of UVa that Dr. Huang be terminated.  Upon the Provost's request, the Faculty Senate organized a Faculty Senate Peer Review Panel ("FSPRP") to review the proposed termination of Dr. Huang.  On or

4

about August 25, 2010, the FSPRP issued an eleven-page report, concluding that "the possibility that Dr. Huang's nonrenewal was at least in part an act of retaliation cannot be ruled out definitively" and that "the University has not met its burden in justifying termination." Additionally, the FSPRP recommended that the School of Medicine make every effort to enable Dr. Huang to complete his grant.

Upon reviewing the FSPRP report, the FSGC submitted its final report to the President of UVa on or about September 3, 2010.  The FSGC report acknowledged that Dr. Li's assigning Ms. Gautier to the ANKK1 project was a "serious breach of University policy."  Am. Compl. ¶ 69.  Thereafter, the Provost permitted Dr. Huang to remain on administrative leave through November 2010.  However, after not hearing anything from the President of UVa regarding his allegations of retaliation, Dr. Huang filed a grievance appeal with the Board of Visitors on or about October 31, 2010.  Subsequently, on or about November 17, 2010, UVa offered to extend Dr. Huang's employment contract by one year.  Because UVa had not addressed Dr. Li's wrongful actions or whether the actions taken against him were retaliatory, Dr. Huang declined the employment extension offer, fearing that further retaliation would ensue.  Ultimately, on or about February 28, 2011, the Board of Visitors declined to grant Dr. Huang's grievance appeal. On or about May 19, 2011, UVa closed out the ANKK1 project.

In his amended complaint, Dr. Huang brings claims under the False Claims Act, 31 U.S.C. § 3730(h) ("FCA"), the Civil Rights Act of 1871, 42 U.S.C. § 1983 ("§ 1983"), the Fraud and Abuse Whistle Blower Protection Act, Va. Code § 2.2-3009, *et seq.* ("FAWBPA"), and common law breach of contract.  Generally, Dr. Huang alleges that Defendants retaliated against him for making disclosures about the the fraudulent misappropriation of public funds by Dr. Li, and that these disclosures were protected by the FCA and the FAWBPA.  Additionally, Dr.

Huang alleges that Defendants retaliated against him for exercising his constitutional free speech right to speak out on a matter of public concern.  Dr. Huang also alleges that Defendants failed and refused to perform their obligations under the NIH grant contract.   Dr. Huang seeks economic and compensatory damages, equitable relief (including but not limited to reinstatement), and attorney's fees.

Pursuant to Federal Rule of Civil Procedure 12(b)(6), Defendant UVa has moved for dismissal of all claims against it.  Defendants Dr. Li and Dr. Johnson have similarly moved to dismiss all claims asserted against them in their official capacities.  And all Defendants have moved to dismiss Dr. Huang's First Amendment retaliation claim under §1983 in its entirety.

## II.  Standard of Review

A motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) tests the legal sufficiency of a complaint to determine whether the plaintiff has properly stated a claim; "it does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Republican Party of N.C. v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992).  In considering a Rule 12(b)(6) motion, a court must accept all factual allegations in the complaint as true and must draw all reasonable inferences in favor of the plaintiff.  *Erickson v. Pardus*, 551 U.S. 89, 94 (2007).  Legal conclusions in the guise of factual allegations, however, are not entitled to a presumption of truth.  *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1950–51 (2009).  Although a complaint "does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitle[ment] to relief requires more than labels and conclusions, and a formulaic recitation of a cause of action's elements will not do."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citations and quotations omitted).  Thus, "[f]actual allegations must be enough to raise a right to relief above the speculative level."  *Id.*

In sum, Rule 12(b)(6) does "not require heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face." *Id.* at 570.  Consequently, "only a complaint that states a plausible claim for relief survives a motion to dismiss." *Iqbal*, 129 S. Ct. at 1950 (citing *Twombly*, 550 U.S. at 556).  If, after accepting all well-pleaded allegations in the plaintiff's favor, it appears that the plaintiff cannot prove any set of facts in support of his claim entitling him to relief, a motion to dismiss under Rule 12(b)(6) should be granted. *Edwards v. City of Goldsboro*, 178 F.3d 231, 244 (4th Cir. 1999).

### III.  Discussion

### A.  Count I: False Claims Act

In Count I, Dr. Huang asserts claims against Dr. Li and Dr. Johnson in both their individual and official capacities for retaliating against him in violation of the False Claims Act, 31 U.S.C. § 3730(h).  More specifically, Dr. Huang alleges that Dr. Li misappropriated public funds that had been granted by the NIH and dedicated to the ANKK1 project by inappropriately assigning the levels of effort for him and Ms. Gautier.  Am. Compl. ¶ 79.  These effort levels exaggerated the amount of work that was being done on the ANKK1 project. *Id.*  Dr. Huang alleges that the drawing of funds from the ANKK1 project to pay Dr. Li's and Ms. Gautier's salaries represented false claims of public funds in violation of the False Claims Act.  Am. Compl. ¶¶ 81–83.  Moreover, Dr. Huang states that Dr. Li and Dr. Johnson had a duty under 31 U.S.C. § 3730(h)(1) to refrain from taking retaliatory actions against employees who, like him, undertake lawful actions in furtherance of a FCA claim.  Am. Compl. ¶ 84.  Dr. Huang asserts that he took such lawful actions by investigating and raising concerns to UVa personnel that Dr. Li had deliberately attempted to defraud the federal government by drawing funds inappropriately from the ANKK1 project account for work that was not performed.  Am. Compl.

¶ 86.  After Dr. Huang disclosed his suspicions to Dr. Johnson and Mr. Benham, Dr. Li and Dr. Johnson "almost immediately retaliated" against Dr. Huang by informing him that his employment contract would not be renewed.  Am. Compl. ¶ 88.  Dr. Huang also alleges that as he worked through UVa's grievance procedures, he was further retaliated against by having "severe restrictions" imposed on his employment that curtailed his ability to conduct his research.  Am. Compl. ¶ 89.  Finally, Dr. Huang alleges that these retaliatory actions would not have been taken by Dr. Li and Dr. Johnson had it not been for Dr. Huang's disclosure of Dr. Li's misappropriation of public funds.  Am. Compl. ¶ 90.

At the outset, I note that Defendants have moved for complete dismissal of Dr. Huang's FCA claims against Dr. Li and Dr. Johnson in their official capacities.[3]  However, because Dr. Huang appears to be seeking both damages and prospective relief from Dr. Li and Dr. Johnson in their official capacities, I find it efficacious to address these official-capacity FCA claims separately as they relate to these two distinct forms of relief.

1.  Official-Capacity FCA Claim for Damages

In *Will v. Michigan Department of State Police*, 491 U.S. 58, 71 (1989), the Supreme Court held that "a suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office."  Therefore, for the purposes of FCA liability, Dr. Li and Dr. Johnson are, in their official capacities, synonymous with UVa.  And UVa is unquestionably an instrumentality of the Commonwealth of Virginia.  *See Jones v. Commonwealth*, 267 Va. 218, 224, 591 S.E.2d 72, 76 (2004) ("The University is a governmental entity.  Its powers and duties, exercised by the Rector and Visitors of the University, are created by statute and are controlled by the General Assembly.").  As a general matter, in order for an

---

[3] Defendants have *not* moved to dismiss Dr. Huang's FCA claim brought against Dr. Li and Dr. Johnson in their individual capacities.  Therefore, that claim is not dismissed and shall remain.

agency of the state like UVa to be liable under the FCA, it must be a "person."  *See* 31 U.S.C. §

3729(a) (subjecting to liability "any person" who, *inter alia*, "knowingly presents, or causes to

be presented, to an officer or employee of the United States Government . . . a false or fraudulent

claim for payment or approval").  In *Vermont Agency of Natural Resources v. United States ex*

*rel. Stevens*, 529 U.S. 765, 781–82 (2000), a *qui tam* action, the Supreme Court held that the

term "person" as used in the FCA did not include states or state entities, thus barring the relator's

claim.[4]  As Defendants seem to acknowledge, *Stevens*, while somewhat relevant to the inquiry

here, is by no means dispositive with respect to whether Dr. Huang may bring his FCA

retaliation claim for damages against Dr. Li and Dr. Johnson in their official capacities.  As

mentioned, *Stevens* was a *qui tam* action in which the Court was addressing whether a private

individual could bring suit against a state (or its entity) in federal court on behalf of the United

States.  In the instant case, the relevant inquiry is whether suit can be brought against a state (or

its entity) in federal court for an act of retaliation under 31 U.S.C. § 3730(h)(1).[5]  Defendants

argue that a retaliation claim under the FCA, like Dr. Huang's in this case, that is asserted against

---

[4] While the Court in *Stevens* did not make a ruling with respect to whether the Eleventh Amendment bars a FCA claim against a state, it did note that "there is 'a serious doubt' on that score."  529 U.S. at 787 (quoting *Ashwander v. TVA*, 297 U.S. 288, 348 (1936) (Brandeis, J., concurring)).

[5] In full, § 3730(h)(1) currently provides:

> Any employee, contractor, or agent shall be entitled to all relief necessary to make that employee, contractor, or agent whole, if that employee, contractor, or agent is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee, contractor, agent or associated others in furtherance of an action under this section or other efforts to stop 1 or more violations of this subchapter.

31 U.S.C. § 3730(h)(1) (2010). This subsection was amended in 2009 to include "contractor" and "agent" along with "employee."  *See* Pub. L. 111-21, § 4(d), 123 Stat. 1624 (2009).  Additionally, the amendment eliminated language referring to potential defendants as "employers," and left the universe of potential defendants under § 3730(h) undefined.  In 2010, § 3730(h)(1) was amended again, this time simply to clean-up the language of the subsection. *See* Pub. L. 111-203, § 1079A(c)(1), 124 Stat. 2079 (2010).  As opposed to the 2009 amendment, the 2010 amendment does not appear to have materially changed the meaning or breadth of § 3730(h)(1).  As a result, it is not necessary to decide which version of § 3730(h)(1) governs because, for the purposes of this case, both the current, 2010 version and the 2009 version lead to the same result.  *See United States ex rel. Dyer v. Raytheon Co.*, No. 08-10341, 2011 WL 3294489, at *11 n.11 (D. Mass. July 29, 2011).

a state entity is barred, regardless of the fact that § 3730(h) does not contain the word "person" as § 3729(a) does.

Before resolving this question, I observe the well-founded tenet that a federal statute like the FCA should be read to allow suits against states (and their equivalents) "only by clearly expressing such an intent." *Stevens*, 529 U.S. at 780; *see also Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 55–57 (1996). Fittingly, "the standard for interpreting a statute to contain a congressional waiver of state sovereign immunity remains a high one." *Bell v. Dean*, No. 2:09-CV-1082, 2010 WL 1856086, at *3 (M.D. Ala. May 4, 2010). In *Elizondo v. University of Texas at San Antonio*, No. CIVASA-04-CA0-1025, 2005 WL 823353, at *4 (W.D. Tex. April 7, 2005), the court examined the pre-2009 amendment version of § 3730(h), which still contained the word "employer." The court concluded that "employer," like "person" in other statutory contexts, should not be read to include states absent a clear indication from Congress intending as much. *Id.* at *4–5. After conducting an inquiry into the relevant text and legislative history, the court found that no "clear statement" subjecting states to suit under § 3730(h) existed and accordingly dismissed the plaintiff's FCA retaliation claim. *Id.* at *5. In an earlier case, the United States Court of Appeals for the Fifth Circuit similarly held that § 3730(h) claims against the states are barred; however, it grounded its decision in the Eleventh Amendment. *United States ex rel. Foulds v. Texas Tech. Univ.*, 171 F.3d 279, 294–95 (5th Cir. 1999); *see also United States ex rel. Moore v. Univ. of Mich.*, 860 F. Supp. 400, 405 (E.D. Mich. 1994) (dismissing the plaintiff's FCA retaliation claim against the university "[b]ecause § 3730(h) is silent on the issue of Eleventh Amendment immunity and does not make the United States a party to the claim . . .").

Dr. Huang argues that the foregoing case law is of limited import because most of the cases addressed pre-2009 versions of § 3730(h) and thus did not consider that section in light of

the broader reach Congress has since intended for it.  However, in *Bell*, the court did analyze the post-amendment version of § 3730(h).  While the court found that § 3730(h) was undoubtedly broader in scope after the 2009 amendment, it concluded that § 3730(h) did not reach far enough to subject states to liability for retaliation claims brought under it.  2010 WL 1856086, at *3 n.5 ("These changes broaden the statute in some respects, but do not add a 'clear statement' of congressional intent to waive state sovereign immunity.").  Ultimately, I agree with the *Bell* court's assessment; it is indeed difficult to conceive of "a more 'general' statutory scheme than one simply stating that certain persons are entitled to relief, without making any specification about who may be sued to obtain that relief." *Id.* at *4.  As such, Dr. Huang has not demonstrated that Congress intended to waive state sovereign immunity in § 3730(h).  Consequently, his official-capacity claim for damages under the FCA against Dr. Li and Dr. Johnson must be dismissed.

### 2. Official-Capacity FCA Claim for Prospective Relief

Dr. Huang asserts that his FCA claims against Dr. Li and Dr. Johnson in their official capacities should not be dismissed in their entirety because he is also seeking equitable relief from them as well, "including but not limited to reinstatement." Am. Compl. 17.  It is well-established that "official-capacity actions for prospective relief are not treated as actions against the State" and thus are not, like claims for damages, barred for the reasons articulated above. *Will*, 491 U.S. at 71 n.10 (quoting *Kentucky v. Graham*, 473 U.S. 159, 167 n.14 (1985)). Further, the FCA does provide an avenue for plaintiffs to seek injunctive relief. *See* 31 U.S.C. § 3730(h)(2) ("Relief under paragraph (1) shall include reinstatement with the same seniority status that employee, contractor, or agent would have had but for his discrimination . . . .").

Therefore, Dr. Huang urges that I not dismiss his claims against Dr. Li and Dr. Johnson in their official capacities, at least with respect to the equitable relief he seeks.

Initially, it must be noted that the facts presented by this case are somewhat unusual in that Dr. Huang evidently now seeks that which he previously turned down: namely, reinstatement to the position in which he was non-renewed.  In November 2010, UVa offered to reinstate him for one year, presumably to make up for the "lost" year of his original employment contract during which time he was pursuing his grievances through the University's channels and during which time he was, for a period, placed on paid administrative leave.  In light of these facts, I share Defendants' concern that equitable relief in the form of reinstatement might ultimately prove to be "circular and futile."   Reply Mem. Supp. Defs.' Mot. Dismiss 8.  However, at this juncture, I cannot say that Dr. Huang has failed to allege sufficient facts to make out this claim or that permitting him to pursue this claim "makes no practical sense."  *Id.*

While there is little case law here directly on point, I believe a fair analogy can be made to the employment discrimination setting.  On multiple occasions, the United States Court of Appeals for the Eleventh Circuit has examined the effect of a plaintiff's rejection of an employer's offer of reinstatement in the context of the Age Discrimination in Employment Act, 29 U.S.C. § 621, *et seq.* ("ADEA").  For example, in *Hurley v. Racetrac Petroleum, Inc.*, 146 F. App'x 365, 366–67 (11th Cir. 2005), the court addressed whether a plaintiff who had turned down an unconditional offer of employment could later seek equitable relief in the form of front pay or reinstatement.  The court concluded that "where a plaintiff requests reinstatement or back pay, once an employer makes a 'good faith' offer of reinstatement, a plaintiff who rejects the offer forfeits his right to such equitable relief unless his refusal of the employer's offer was reasonable."  *Id.* at 368 (citation omitted); *accord Giandonato v. Sybron Corp.*, 804 F.2d 120,

124 (10th Cir. 1986) ("Courts have recognized that the circumstances surrounding an employee's refusal to accept reinstatement may affect the employee's right to additional relief."). The reason for this rule—at least within the ADEA context—is that a "contrary holding would allow an employee to avoid her obligation to mitigate damages by holding out for a court-ordered reinstatement." *Stanfield v. Answering Serv., Inc.*, 867 F.2d 1290, 1296 (11th Cir. 1989) (citing *Claiborne v. Ill. Cent. R.R.*, 583 F.2d 143, 153 (5th Cir. 1978)). Ultimately, it is the trier of fact who determines whether a plaintiff is reasonable in rejecting a job offer made subsequent to an act of alleged unlawful discrimination. *See O'Donnell v. Ga. Osteopathic Hosp., Inc.*, 748 F.2d 1543, 1551 (11th Cir. 1984). And this makes perfect sense, given that whether a reasonable person would have refused the offer is a question of fact. *See Blasic v. Chugach Support Servs., Inc.*, 673 F. Supp. 2d 389, 403 (D. Md. 2009) (adopting this reasoning in the context of an employment discrimination suit brought pursuant to § 1981 and Title VII). Reasonableness, as an objective test, is determined from the totality of the circumstances. *Id.*; *see also Smith v. World Ins. Co.*, 38 F.3d 1456, 1464 (8th Cir. 1994); *Geiger v. Kraft Foods Global, Inc.*, No. 1:06-CV-874, 2008 WL 648192, at *5 (S.D. Ohio Mar. 4, 2008); *Miano v. AC&R Adver., Inc.*, 875 F. Supp. 204, 223–24 (S.D.N.Y. 1995).

Sometimes, as may be the case in this matter, reinstatement is not appropriate (because, for example, the work environment would be too hostile) or feasible (because, for example, the position no longer exists). In such instances, an alternative equitable remedy, front pay, may be available. *Duke v. Uniroyal Inc.*, 928 F.2d 1413, 1423–24 (4th Cir. 1991). Courts have observed that front pay may, for example, "be particularly appropriate in lieu of reinstatement where discord and antagonism between the parties would render reinstatement ineffective as a make-whole remedy." *Goldstein v. Manhattan Indus.*, 758 F.2d 1435, 1449 (11th Cir. 1985); *see also*

13

*E.E.O.C. v. Prudential Fed. Sav. and Loan Ass'n*, 763 F.2d 1166, 1172 (10th Cir. 1985); *Dickerson v. Deluxe Check Printers, Inc.*, 703 F.2d 276, 291 (8th Cir. 1983).  However, whether front pay would even be available in this case under 31 U.S.C. § 3730(h)(2) is not clear.  While it is true that the "first remedial principle of the FCA is that the employee is 'entitled to all relief necessary to make the employee whole,'" front pay is not, like reinstatement, specifically listed as a remedy available to the court.  *Wilkins v. St. Louis Hous. Auth.*, 198 F. Supp. 2d 1080, 1091 (E.D. Mo. 2001) (quoting 31 U.S.C. § 3730(h)).  In *Wilkins*, the court reasoned that Congress must have "intended that front pay be awarded in the appropriate case to effect the express Congressional intention that a claimant under § 3730(h) be made whole."  *Id.*  Although this conclusion is perfectly logical, and may indeed be correct, it does not appear to be settled law.

Regardless of whether the equitable relief sought by Dr. Huang takes the form of reinstatement or front pay, at this point, it is not possible to say whether such is precluded by Dr. Huang's rejection of UVa's November 2010 offer to reinstate him to his position.  Additionally, I must accept the facts pled by Dr. Huang as true, and as alleged, they do not demonstrate that his rejection of the offer was necessarily unreasonable such that he cannot possibly obtain equitable relief.   Similarly, there has not been enough factual development to determine whether reinstatement is even feasible in light of the ANKK1 grant's expiration.  Indeed, these questions, on the basis of the facts contained within the amended complaint, cannot be resolved now at the motion to dismiss stage.  Therefore, I will deny Defendants' motion to dismiss Dr. Huang's FCA claim for prospective relief against Dr. Li and Dr. Johnson in their official capacities.

## B.  Count II: 42 U.S.C. § 1983 and the First Amendment

In Count II, Dr. Huang similarly asserts claims against Dr. Li and Dr. Johnson in both their individual and official capacities for retaliating against him in violation of the Civil Rights Act of 1871, 42 U.S.C. § 1983.  More specifically, Dr. Huang states that in or about October 2009, he exercised his rights under the First Amendment to the United States Constitution by reporting Dr. Li's alleged misappropriation of public funds and expressing his opinion that Dr. Li's actions represented a violation of the FCA.  Am. Compl. ¶ 94.  According to Dr. Huang, he made these statements as a private citizen, not as the principal investigator on the ANKK1 project, because at that time he had effectively been removed as such by Defendants' "abuse of power."  Am. Compl. ¶ 95.  Dr. Huang asserts that his interest in expression on this matter of public concern "outweighed his employer's interest in providing effective and efficient services to the public."  Am. Compl. ¶ 96.  Dr. Huang alleges that Dr. Li and Dr. Johnson acted under color of state law when they notified him that his employment contract would not be renewed shortly after Dr. Huang had disclosed his suspicions.  Am. Compl. ¶¶ 97–98.

However, Defendants broadly argue that Dr. Huang's First Amendment retaliation claims—that is, the claims against Dr. Li and Dr. Johnson in both their individual and official capacities—should be dismissed in their entirety.  According to Defendants, Dr. Huang cannot state a claim under § 1983 for deprivation of his First Amendment rights because the speech at issue in this case was not protected by the First Amendment.

To be sure, "public employees do not surrender all their First Amendment rights by reason of their employment.  Rather, the First Amendment protects a public employee's right, in certain circumstances, to speak as a citizen addressing matters of public concern."  *Garcetti v. Ceballos*, 547 U.S. 410, 417 (2006) (citations omitted).  Clearly, though, this right is not

15

limitless.  In *Pickering v. Board of Education of Township High School District 205*, 391 U.S. 563 (1968) and its progeny, the Supreme Court has identified two lines of inquiry to guide courts in the interpretation of the constitutional protections afforded to public employee speech. *Garcetti*, 547 U.S. at 418.  The first question is "whether the employee spoke as a citizen on a matter of public concern."  *Id.* (citing *Pickering*, 391 U.S. at 568).  If the employee did not, he cannot pursue a First Amendment cause of action.  *Id.*  (citing *Connick v. Myers*, 461 U.S. 138, 147 (1983)).  However, if the employee did speak as a citizen on a matter of public concern, the question becomes "whether the relevant government entity had an adequate justification for treating the employee differently from any other member of the general public."  *Id.*  (citing *Pickering*, 391 U.S. at 568).  With respect to the first inquiry—that is, whether the employee spoke as a citizen on a matter of public concern—the Supreme Court has held that "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline."  *Garcetti*, 547 U.S. at 421.[6]  Application of this rule in the case at hand presents a significant instance of dispute between Dr. Huang and Defendants.

On the one hand, Defendants point out that Dr. Huang's complaints and reports in this case were undertaken while he was serving as the principal investigator on the ANKK1 project. Indeed, in his amended complaint, Dr. Huang states that "it was his responsibility to allocate, alter, and approve any level of effort" on the ANKK1 project, and it was problems in such that he identified.  Am. Compl. ¶ 38.  Therefore, Defendants argue that Dr. Huang's statements were made in the course of his official duties and, as a result, were not insulated from employer

---

[6] Further, "the First Amendment does not prohibit managerial discipline based on an employee's expressions made pursuant to official responsibilities."  *Garcetti*, 547 U.S. at 424.  Thus, while "[e]xposing governmental inefficiency and misconduct is a matter of considerable significance . . . [t]he dictates of sound judgment are reinforced by the powerful network of legislative enactments—such as whistle-blower protection laws and labor codes—available to those who seek to expose wrongdoing."  *Id.* at 425.

discipline.  In furtherance of this position, Defendants cite a series of cases presenting factual situations similar to those in this case.  *See, e.g.*, *Renken v. Gregory*, 541 F.3d 769, 774–75 (7th Cir. 2008) (finding that a faculty member's allegations of misuse of grant funds of which he was in charge constituted official speech and were not entitled to First Amendment protection); *Casey v. W. Las Vegas Indep. Sch. Dist.*, 473 F.3d 1323, 1334 (10th Cir. 2007) (concluding that a school superintendent's complaints to other school officials about administration of Head Start funds were launched in the course of carrying out her official responsibilities and therefore that they were not eligible for First Amendment protection); *Battle v. Bd. of Regents*, 468 F.3d 755, 761–62 (11th Cir. 2006) (holding that a university employee's report of alleged improprieties with respect to her supervisor's handling of federal financial aid funds constituted official speech and was not entitled to First Amendment protection); *Kalderon v. Finkelstein*, No. 08 Civ. 9440, 2010 U.S. Dist. LEXIS 88099, at *61–65 (S.D.N.Y. Mar. 10, 2010) (magistrate judge concluding that a principal investigator on an NIH grant who alleged mishandling of the grant's funds made her comments pursuant to her official duties and was not entitled to First Amendment protection); *Abreu-Velez v. Bd. of Regents of Univ. Sys. of Ga.*, CV 105-186, 2009 U.S. Dist. LEXIS 10474, at *24 (S.D. Ga. Feb. 12, 2009), *aff'd*, 2009 U.S. App. LEXIS 15203 (11th Cir. July 8, 2009) (deciding that compliance coordinator's reports regard problems with the administration of clinical trials were official statements not entitled to First Amendment protection).

While these cases are certainly relevant to the inquiry here, they are distinguishable in significant respects, such that they cannot be controlling (aside, of course, from the fact that they come from other circuits).  In *Renken*, *Casey*, *Battle*, and *Abreu-Velez*, the courts were deciding defendants' motions for summary judgment as opposed to motions to dismiss as is the case here.

Therefore, when those courts heard those cases, they necessarily had more factual development to consider.  It is true that in *Kalderon*, the magistrate judge granted the defendants' motion to dismiss the plaintiff's First Amendment retaliation claim, and that the district court subsequently accepted that conclusion.  *Kalderon v. Finkelstein*, No. 08 Civ. 9440, 2010 U.S. Dist. LEXIS 88036, at *5–6 (S.D.N.Y. Aug. 24, 2010).  Further, the facts of *Kalderon* are admittedly quite similar to those in the instant case.  The plaintiff, a biomedical research scientist employed by a university as the principal investigator on an NIH grant, alleged retaliation for speaking out about mishandling and misuse of the grant funds.  2010 U.S. Dist. LEXIS 88099, at *60–62. However, unlike Dr. Huang, the plaintiff in *Kalderon* conceded in her complaint that she had been speaking out pursuant to her "duties/obligations" as the principal investigator.  *Id.* at *62. Further, she stated in her complaint that her role as principal investigator included responsibility for "monitoring the grantee's compliance with respect to the grant's funds and available facilities."  *Id.*  Significantly, in the case at hand, Dr. Huang has not stated as much in his complaint.  Indeed, when asked at oral argument whether Dr. Huang had any legal (as opposed to moral) obligations under the NIH grant to report suspected fraud to his superiors within the Department, his counsel responded that the extent of any such legal duties was still unknown.

Additionally, Defendants argue that Dr. Huang's complaints about the administration of the ANKK1 project's funds amount to official speech entitled to no First Amendment protection because they were entirely internal in nature.  Defendants maintain that such internal communication between employees in the workplace is typically considered official speech and not entitled to First Amendment protection.  In support thereof, Defendants direct the Court's attention to several cases that have utilized the internal nature or form of communication as an indicator of its unprotected quality.  *See, e.g.*, *Morey v. Somers Cent. Sch. Dist.*, 410 F. App'x

398, 400 (2d Cir. 2011); *Weintraub v. Bd. of Educ.*, 593 F.3d 196, 204–05 (2d Cir. 2010); *Boyce v. Andrew*, 510 F.3d 1333, 1343–44 (11th Cir. 2007); *Green v. Bd. of County Comm'rs*, 472 F.3d 794, 800–01 (10th Cir. 2007); Savage v. Gee, 716 F. Supp. 2d 709, 718 n.7 (S.D. Ohio 2010); *Jackson v. Alleghany County*, No. 7:07CV0417, 2008 U.S. Dist. LEXIS 66499, at *28 (W.D. Va. Aug. 28, 2008). However, not only were all of these cases decided at the summary judgment stage, but it must also be pointed out that while the internal nature of an employee's speech might suggest that it is unprotected by the First Amendment, that factor, though potentially of significant relevance, is simply one among many indicia and is not dispositive. Thus, the fact that Dr. Huang did not speak outside of the University setting cannot, by itself, dictate at this juncture whether he was speaking as a private citizen on a matter of public concern.

For his part, Dr. Huang maintains that he was not speaking pursuant to his official duties. In support of this view, he attempts to draw a distinction between his case and that of the plaintiff in *Garcetti*. In *Garcetti*, a prosecutor wrote a memorandum to his supervisors in which he expressed his opinion that an affidavit used to obtain a search warrant in one of his cases contained misrepresentations and that the case should be dismissed. 547 U.S. at 413–14. Afterwards, he was subjected to retaliatory employment actions. *Id.* at 415. According to Dr. Huang, it was the prosecutor's "clear duty to investigate and make the recommendations that were included in his memorandum." Mem. Opp. Defs.' Mot. Dismiss 7. Conversely, as previously noted, Dr. Huang argues that at this stage in the litigation, it is not clear whether he had legal duties or responsibilities (beyond those that directly pertained to scientific research) to investigate fraud and expose it.

Ultimately, I agree with Dr. Huang that testing whether a given employee's speech falls within his official duties is not an endeavor that lends itself to a formulaic examination. Rather,

the *Garcetti* inquiry is a fact-specific, practical one that has not been reduced to a dispositive test. The United States Court of Appeals for the Fourth Circuit reflected this fact in *Andrew v. Clark*, 561 F.3d 261 (4th Cir. 2009). In *Andrew*, the court stated that whether a memorandum authored by the plaintiff "was written as part of his official duties was a disputed issue of material fact that cannot be decided on a motion to dismiss pursuant to Rule 12(b)(6)." *Id.* at 267 (citing *Bosiger v. U.S. Airways*, 510 F.3d 442, 450 (4th Cir. 2007)). Accordingly, the court reversed the district court's order dismissing the case because the district court had erred in concluding that no reasonable juror could find that the memorandum was anything other than speech pursuant to the plaintiff's official duties. *Id.* Unquestionably, there are appreciable differences between the facts of *Andrew* and those of this case. For example, in *Andrew*, the plaintiff had released to a local newspaper an otherwise internal memorandum that he had authored. *Id.* at 263. In addition, the plaintiff had no duty to write the memorandum, and his supervisor described the memorandum as "unauthorized." *Id.* at 264. However, these differences are not enough to distinguish *Andrew* from the instant case, and they do not vitiate the Fourth Circuit's holding that at the motion to dismiss stage, "the district court was required to accept that statement [that the speech was outside of the plaintiff's official job duties] as true." *Id.* at 268.

Ultimately, although the dispute in *Andrew* over whether the plaintiff's speech fell within his official duties may have been a closer call than it is in this case, Dr. Huang has nevertheless successfully nudged his First Amendment claim across the line of plausibility. While it may yet prove to be true that Dr. Huang had duties or obligations to refer the alleged misuse of grant funds up the chain of command, that much cannot be determined at the motion to dismiss stage in light of the facts alleged in the complaint. Because there appears to be genuine uncertainty with respect to the extent of Dr. Huang's official duties, I cannot conclude that his speech

regarding the alleged misappropriation of grant funds is precluded from First Amendment protection. Dr. Huang is entitled to discovery on this question in order to determine precisely what the duties of a principal investigator at UVa are in this context (and whether he was acting within the scope of those duties). Therefore, I will not dismiss his First Amendment claims pursuant to § 1983 in their entirety.[7] However, that does not mean that every one of those claims can remain.

With regard to Dr. Huang's § 1983 claim for damages against Dr. Li and Dr. Johnson in their official capacities, Defendants correctly argue that this claim must be dismissed. To state a cause of action under § 1983, a plaintiff must allege facts indicating that he has been deprived of rights guaranteed by the Constitution or laws of the United States and that this deprivation resulted from conduct committed by a person acting under color of state law. *See* 42 U.S.C. § 1983 ("Every person who, under color of any [state law] subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . ."). Thus, in order to be found liable under § 1983, an entity must qualify as a "person." Plainly, Dr. Li and Dr. Johnson literally qualify as "persons." However, as previously noted in the discussion of Dr. Huang's FCA claims, the Supreme Court in *Will* held that "a suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's

---

[7] Because I find that Dr. Huang has alleged sufficient facts to maintain that his speech falls outside of his official duties, I find it unnecessary to address whether his speech relates to his scholarship for purposes of the First Amendment. In *Garcetti*, the Supreme Court acknowledged that its ruling with respect to "official duty" speech might be different in the higher education context if there were "some argument that expression related to academic scholarship or classroom instruction" implicating "additional constitutional interests" was at issue. 547 U.S. at 425. In their briefs and at oral argument, the parties in the case at hand debated the application of this dictum. Defendants argue that no such interests in scholarship or academic freedom are implicated by the relevant speech whereas Dr. Huang maintains that his reports of impropriety related directly to his ability to continue his scholarship. While the parties may wish to conduct further discovery on this issue as well, its resolution is not necessary at this stage given that I will not dismiss Dr. Huang's First Amendment claims in their entirety.

office." 491 U.S. at 71.  Therefore, for the purposes of § 1983 liability, Dr. Li and Dr. Johnson

are, in their official capacities, synonymous with UVa.  In *Will*, the Supreme Court explicitly

held that "a State is not a person within the meaning of § 1983."  *Id.* at 64.  UVa, as an

instrumentality of the state, is considered the same as the state under *Will*.  *See Jones*, 267 Va. at

224, 591 S.E.2d at 76; *see also Huang v. Bd. of Governors of Univ. of N.C.*, 902 F.2d 1134, 1139

n.6 (4th Cir. 1990) (holding that North Carolina State University and the University of North

Carolina, as "alter egos of the state," are not "persons" within the meaning of § 1983).

Consequently, Dr. Huang cannot maintain his claim for damages against Dr. Li and Dr. Johnson

in their official capacities because they are, in such capacity, equivalent to UVa, which is an

entity of the state and thus not a "person" as required by § 1983.  Accordingly, that claim must

be dismissed.[8]

However, Dr. Huang's claims for monetary damages against Dr. Li and Dr. Johnson in

their *personal* capacities are, of course, not barred under this logic.  *See Hafer v. Melo*, 502 U.S.

21, 27 (1991) ("[O]fficers sued in their personal capacity come to court as individuals.  A

government official in the role of personal-capacity defendant thus fits comfortably within the

statutory term 'person.'").  Therefore, Dr. Huang's § 1983 claim against Dr. Li and Dr. Johnson

in their individual capacities is not dismissed.

Similarly, the aforementioned law does not apply to Dr. Li and Dr. Johnson to the extent

that Dr. Huang is seeking prospective relief against them in their official capacities under well-

established Supreme Court doctrine: "a state official in his or her official capacity, when sued for

---

[8] Alternatively, Dr. Huang's § 1983 claim for money damages against Dr. Li and Dr. Johnson in their official capacities can also be dismissed on the basis of the immunity from suit provided by the Eleventh Amendment.  A federal court cannot award § 1983 damages against a state official sued in his official capacity.  *Edelman v. Jordan*, 415 U.S. 651, 663 (1974) ("'[W]hen the action is in essence one for the recovery of money from the state, the state is the real, substantial party in interest and is entitled to invoked its [Eleventh Amendment] sovereign immunity from suit even though individual officials are nominal defendants.'") (quoting *Ford Motor Co. v. Dep't of Treasury*, 323 U.S. 459, 464 (1945)).

injunctive relief, would not be a person under § 1983." *Will*, 491 U.S. at 71 n.10 (citing *Graham*, 473 U.S. at 167 n.14; *Ex Parte Young*, 209 U.S. 123, 159–60 (1908)).  For the same reasons set forth in the preceding section regarding his FCA claims, I find that Dr. Huang has pled sufficient facts to state a claim for prospective relief against Dr. Li and Dr. Johnson.  As a result, I deny Defendant's motion to dismiss Dr. Huang's § 1983 claim for prospective relief against Dr. Li and Dr. Johnson in their official capacities.

### C.  Count III: Fraud and Abuse Whistle Blower Protection Act

In Count III, Dr. Huang alleges that his reports regarding the suspected wrongdoing of Dr. Li were protected under the Fraud and Abuse Whistle Blower Protection Act, Va. Code § 2.2-3009, *et seq.* ("FAWBPA").  Am. Compl. ¶¶ 109–10.  Further, Dr. Huang alleges that Dr. Li and Dr. Johnson, acting in their official capacities, retaliated against him for making these protected reports by refusing to extend his employment contract.  Am. Compl. ¶ 111.  In Count III, Dr. Huang also asserts a claim under the FAWBPA against UVa.  He alleges that as he worked his way through its grievance process, UVa retaliated against him by imposing restrictions on his employment and hampering his ability to continue his research.  Am. Compl. ¶ 112.

Defendants argue that Dr. Huang's FAWBPA claims against UVa, Dr. Li, and Dr. Johnson should be dismissed, and I agree.  Dr. Huang maintains that there is jurisdiction over his FAWBPA claims because he has met the requirements of the supplemental jurisdiction statute. *See* 28 U.S.C. § 1367(a) ("[I]n any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.").  Although these

requirements may indeed be fulfilled in this case, Dr. Huang evidently overlooks the fact that the Eleventh Amendment to the Constitution trumps § 1367(a); it bars not just federal claims asserted against a state in federal court but pendent state law claims as well.  *See Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 121 (1964) ("[N]either pendent jurisdiction nor any other basis of jurisdiction may override the Eleventh Amendment.").

As a general matter, the Eleventh Amendment prevents a private individual from suing a nonconsenting state in federal court.  *See Bd. of Trs. of Univ. of Ala. v. Garrett*, 531 U.S. 356, 363 (2001); *Kimel v. Fla. Bd. of Regents*, 528 U.S. 62, 73 (2000).  The Eleventh Amendment applies "not only [when] a State is actually named as the defendant, but also [when] state agents or state instrumentalities [are the defendants]."  *Regents of the Univ. of Cal. v. Doe*, 519 U.S. 425, 429 (1997); *see also Tigrett v. Rector and Visitors of Univ. of Va.*, 97 F. Supp. 2d 752, 756 (W.D. Va. 2000), *aff'd*, 290 F.3d 620 (4th Cir. 2002) (noting the fact that UVa is an instrumentality of the state entitled to immunity from suit in federal court under the Eleventh Amendment); *Cobb v. Rector and Visitors of Univ. of Va.*, 69 F. Supp. 2d 815, 823–24 (W.D. Va. 1999), *aff'd*, 229 F.3d 1142 (4th Cir. 2000) (same).  Therefore, in suing Dr. Li and Dr. Johnson in their official capacities (and, of course, in suing UVa directly), Dr. Huang has effectively brought his FAWBPA claim against a state in federal court.  Federal courts only have subject matter jurisdiction over such suits when either: "(1) the state consents to be sued in federal court, or (2) Congress has abrogated the states' Eleventh Amendment immunity through a 'clear expression of legislative intent to abrogate' that is exercised pursuant to Congress' power under § 5 of the Fourteenth Amendment."  *Madden v. Virginia*, No. 3:11CV241, 2011 WL 2559913, at *2 (E.D. Va. June 28, 2011) (quoting *CSX Transp., Inc. v. Bd. of Pub. Works of W. Va.*, 138 F.3d 537, 539 (4th Cir. 1998)).  Plainly, the latter is not implicated in this case.  With

respect to a state's consent to suit in federal court, the relevant test is a "stringent one." *College Sav. Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd.*, 527 U.S. 666, 675 (1999). The state must either invoke federal jurisdiction itself or make a "clear declaration that it intends to submit itself to federal jurisdiction, by enactment [of a statute]." *Madden*, 2011 WL 2559913, at *2 (citations omitted).

With respect to the FAWBPA, there is no indication that Virginia intended to waive its immunity from suit in federal court for the purposes of retaliation claims. While the General Assembly did explicitly create a remedy for such retaliation in the courts of Virginia, a state's waiver of sovereign immunity from liability in state court is not an automatic waiver of Eleventh Amendment immunity in the federal courts. *Fla. Dep't of Health v. Fla. Nursing Home Ass'n*, 450 U.S. 147, 150 (1981) (per curiam). The FAWBPA in part states that "[i]t shall be the policy of the Commonwealth that employees of state government be freely able to report instances of wrongdoing or abuse committed by their employing agency, other state agencies, or independent contractors of state agencies." Va. Code § 2.2-3009. In *Moore v. University of Michigan*, the court held, with respect to a similar statute, that the "Michigan Whistle-Blowers' Protection Act grants a waiver by the State to be sued in state court. No clear language in the statute—indeed no language at all—suggests an abrogation of Michigan's Eleventh Amendment immunity." 860 F. Supp. at 405–06. The court therefore concluded that it had no authority to exercise supplemental jurisdiction over the plaintiff's state law claim brought pursuant to the state whistleblower statute. *Id.* at 406. Similarly, I conclude that Dr. Huang's FAWBPA claims against all Defendants must be dismissed.[9]

---

[9] Briefly, I note that it is unclear whether Dr. Huang is seeking (or, for that matter, even can seek) prospective relief pursuant to FAWBPA. Even if he is, though, the doctrine first enunciated in *Ex Parte Young* and outlined above that otherwise permits claims for prospective relief asserted against individuals in their official capacity would be inapplicable to Dr. Huang's FAWBPA claims against Dr. Li and Dr. Johnson. That doctrine permits such relief in

### D.  Count IV: Breach of Contract

Finally, in Count IV, Dr. Huang alleges common law breach of contract against UVa, Dr. Li, and Dr. Johnson.  In making out this claim, Dr. Huang asserts that the ANKK1 grant funded by NIH was a contract in which UVa was the grantee and he was the principal investigator.  Am. Compl. ¶ 116.  According to Dr. Huang, this contract was breached when

> Defendants failed and refused to tender their performance as required by the grant by depriving Dr. Huang of his role as [principal investigator]; refusing to support the commitment in research support, resource supply, equipment use, and personnel hiring, which Defendants made in Dr. Huang's grant application; personnel withdrawal from the grant and the [principal investigator's] suspension and termination without any prior approval from NIH, and; interruption of the project, as well as abnormal closeout of the grant.

Am. Compl. ¶ 119.  Dr. Huang alleges that Defendants' contractual breach began with the commencement of the ANKK1 project on or about June 15, 2009 and continued until the project was closed out in or about May 2011.  Am. Compl. ¶¶ 120–21.  Dr. Huang alleges that he has suffered damages from Defendants' breach as a third-party beneficiary of the contract.  Am. Compl. ¶ 125.

In order to make out a successful third-party beneficiary claim under Virginia law, the purported third party must establish that "the parties to the underlying contract clearly and definitely intended to confer a benefit upon the alleged beneficiary." *Caudill v. County of Dinwiddie*, 259 Va. 785, 793, 529 S.E.2d 313, 317 (2000) (citations omitted).  Thus, the third party must be a direct, not merely incidental, beneficiary to the contract in question in order to sue for its breach as a third-party beneficiary.  *See, e.g.*, *Bank of Am. v. Musselman*, 240 F. Supp. 2d 547, 554 (E.D. Va. 2003); *Kelley v. Griffin*, 252 Va. 26, 29, 471 S.E.2d 475, 477 (1996).

order to prevent future *federal* constitutional or statutory violations.  *See Milliken v. Bradley*, 433 U.S. 267, 289 (1977) (stating that the *Young* doctrine "permits federal courts to enjoin state officials to conform their conduct to requirements of federal law, notwithstanding a direct and substantial impact on the state treasury") (citation omitted).

Ultimately, "intent is the principal touchstone for determining whether a third party beneficiary contract exists." 13 *Williston on Contracts*, § 37:8 (4th ed. 2011).

At the outset, I note that there can be no serious doubt that a contract existed between NIH and UVa in the form of the ANKK1 grant. Moreover, Dr. Huang unquestionably derived certain benefits from it. For example, part of his salary was drawn from the grant account, and securing the grant was, evidently, integral to his efforts to conduct independent research in his field. Indeed, UVa may not have received the funding from NIH had it not been for Dr. Huang's research proposal. Nevertheless, upon examination of the amended complaint, I find that Dr. Huang has not met his burden of alleging sufficient facts to create a plausible inference that he was an intended third-party beneficiary of the grant contract. In other words, Dr. Huang has failed to plead enough facts to demonstrate that UVa and NIH "clearly and definitely" contracted to confer a benefit on him. *Caudill*, 259 Va. at 793, 529 S.E.2d at 317. While he undoubtedly benefitted from NIH's disbursement of grant funds, the benefits that accrued to him were wholly incidental. In order to allege a claim of breach of contract as a third party beneficiary, Dr. Huang must allege more. Because he has not, his claim for breach of contract cannot stand.

Alternatively, I find that Dr. Huang's breach of contract claim must be dismissed in its entirety because he failed to take the necessary procedural steps that serve as prerequisites to the filing of a contract claim against the Commonwealth of Virginia. "Any person having any pecuniary claim against the Commonwealth upon any legal ground shall present the same to the head of the department, division, institution or agency of the Commonwealth responsible for the alleged act or omission which, if proved, gives rise to the claim." Va. Code § 2.2-814. It is only after such a claim is denied that a claimant's cause of action accrues and permits the claimant to seek redress in "an appropriate circuit court." Va. Code § 8.01-192. Because § 2.2-814

represents a limited waiver of sovereign immunity, it must be strictly construed in favor of the Commonwealth. *Amaram v. Va. St. Univ.*, 476 F. Supp. 2d 535, 540 (E.D. Va. 2007). The proper head of the institution to whom Dr. Huang should have presented his claim was the President of UVa. *See Cominelli v. The Rector and Visitors of the Univ. of Va.*, 589 F. Supp. 2d. 706, 719 (W.D. Va. 2008), *aff'd*, 362 F. App'x 359 (4th Cir. 2010). However, Dr. Huang has not alleged in the amended complaint that he did so. Moreover, the fact that Dr. Huang's counsel may have been in discussions with counsel for UVa before filing suit, or the fact that a draft complaint may have been shared with counsel before filing, does not meet the statutory requirements. *Id.* (finding such actions insufficient to meet the requirements of the statute).

Further, I find that these procedural imperfections were not cured on November 30, 2011 when, according to information in his memorandum opposing Defendants' motion to dismiss, Dr. Huang evidently presented his breach of contract claim to the President of UVa. In *Scallett v. Rosenblum*, No. 6250 (Va. Cir. Ct. Jan. 5, 1998), the court found that the plaintiff's submission of a letter to the Board of Visitors of UVa setting forth his contract claims was insufficient to comply with the statute because he sent it after the suit had already been filed. *Id.* at 6–7. Similarly, in the case at hand, Dr. Huang's submission of his claim to the President of UVa on November 30 came well after the filing of both his complaint and his amended complaint. As such, he has failed to comply with the statutory prerequisites regarding presentment of pecuniary claims, and his breach of contract claim must accordingly be dismissed.[10]

---

[10] Briefly, I observe that, as was the case with his FAWBPA claim, Dr. Huang's breach of contract claim against UVa and against Dr. Li and Dr. Johnson in their official capacities is susceptible to the same Eleventh Amendment doctrine, which necessitates dismissal of the claim. However, because the foregoing grounds support dismissal of the breach of contract claim on their own, I decline to delve any further into that constitutional issue.

## IV.  Conclusion

For the reasons stated herein, Defendants' motion to dismiss shall be granted in part and denied in part.  The result of this ruling is as follows.  Dr. Huang's individual-capacity claim and official-capacity claim for prospective relief against Dr. Li and Dr. Johnson pursuant to the FCA both remain; however, his official-capacity claim for damages against Dr. Li and Dr. Johnson pursuant to the FCA shall be dismissed.  Similarly, Dr. Huang's individual-capacity claim and official-capacity claim for prospective relief against Dr. Li and Dr. Johnson pursuant to § 1983 both remain; however, his official-capacity claim for damages against Dr. Li and Dr. Johnson pursuant to § 1983 shall be dismissed.  Additionally, Dr. Huang's FAWBPA claims against UVa, Dr. Li, and Dr. Johnson shall be dismissed in their entirety.  Finally, Dr. Huang's common law breach of contract claims against UVa, Dr. Li, and Dr. Johnson shall also be dismissed in their entirety.

The Clerk of the Court is hereby directed to send a certified copy of this Memorandum Opinion and the accompanying Order to all counsel of record.

Entered this   19th   day of December, 2011.

NORMAN K. MOON
UNITED STATES DISTRICT JUDGE