# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF VIRGINIA
### CHARLOTTESVILLE DIVISION

| | |
|---|---|
| WEIHUA HUANG, | CASE NO. 3:11-cv-00050 |
| *Plaintiff,* | |
| v. | MEMORANDUM OPINION |
| THE RECTOR AND VISITORS OF THE UNIVERSITY OF VIRGINIA, ET AL., | |
| *Defendants.* | JUDGE NORMAN K. MOON |

This matter, which arises out of the employment of Weihua Huang ("Dr. Huang") by the Rector and Visitors of the University of Virginia ("UVa"), is before the Court on Defendants' motion for summary judgment. Previously, on December 19, 2011, I issued a memorandum opinion and order in which I granted in part and denied in part Defendants' motion to dismiss. In doing so, I dismissed all claims brought against UVa, but I permitted Dr. Huang to pursue some of his claims against the individual Defendants who remain in this action.[1]

Generally, Dr. Huang alleges that Defendants violated his right, secured by the First Amendment to the Constitution, to speak out on a matter of public concern when they retaliated against him for making disclosures about the purported misappropriation of federal grant funds. Further, Dr. Huang contends that these disclosures were protected by the False Claims Act ("FCA"), 31 U.S.C. § 3730. Following rather extensive discovery, the parties briefed the issues raised in Defendants' motion for summary judgment, and I conducted a hearing on August 21, 2012. For the reasons that follow, I will grant in part and deny in part Defendants' motion.

---

[1] Specifically, I declined to dismiss individual-capacity claims for damages brought against Defendants under 42 U.S.C. § 1983 and the False Claims Act, and I declined to dismiss official-capacity claims for prospective injunctive relief asserted against them under the same statutes. However, I dismissed the official-capacity claims for damages that Dr. Huang asserted against Defendants under 42 U.S.C. § 1983 and the False Claims Act.

# I. BACKGROUND

In 1999, Dr. Huang began a post-doctoral fellowship at the University of Tennessee. While there, Defendant Ming Li ("Dr. Li") was assigned as Dr. Huang's supervisor and mentor. In 2005, Dr. Li accepted a tenured position as professor of psychiatric medicine in the Department of Psychiatry and Neurobehavioral Sciences (the "Department") within UVa's School of Medicine.  Defendant Bankole Johnson ("Dr. Johnson"), who was and remains the chairman of the Department, recruited Dr. Li.  At Dr. Li's request, Dr. Huang also transferred to UVa at this time, accepting a temporary position as a tenure-ineligible member of the professional research staff.

According to Dr. Li, at some point in 2007, Dr. Huang began pressuring him for a promotion.  Evidently, a promotion would allow Dr. Huang to renew his work visa, without which he would be forced to return to China.  In August 2007, Dr. Johnson and Dr. Li decided to promote Dr. Huang despite the fact that, at the time, Dr. Huang's level of productivity was "very low" according to Dr. Li.  Li Decl. ¶ 6.  Prior to his promotion, Dr. Huang had no independent research space, equipment, or facilities.  In other words, he was completely dependent upon Dr. Li's grants.  Accordingly, Dr. Johnson and Dr. Li agreed that Dr. Huang's promotion should only occur if it was accompanied by a set of future performance expectations.  In fact, they agreed that these expectations would be represented to Dr. Huang as conditions of his promotion.  On August 13, 2007, Dr. Li met with Dr. Huang to go over these expectations, which included, *inter alia*, an improvement in Dr. Huang's research productivity and an acknowledgement that Dr. Li "would continue to be fully responsible for the research direction and projects in the lab."  Li Decl. ¶ 7.  The expectations were spelled out in writing, and Dr. Huang signed the letter, thus

acknowledging his assent.  As a result, Dr. Huang became a research assistant professor in the Department.[2]

In April 2008, Dr. Li attempted to lower Dr. Huang's salary; however, Dr. Huang refused to agree to the salary reduction.  Thereafter, on May 30, 2008, Dr. Li sent Dr. Huang a letter in which he described his disappointment with Dr. Huang's overall performance.  Dr. Li's issuance of the letter seems to have been precipitated, at least in part, by the friction over Dr. Huang's salary reduction.  In the letter, Dr. Li stated that Dr. Huang's performance was "far below what I expect . . . ."  Li Decl., Ex. B.  Dr. Li outlined four major areas in which Dr. Huang was expected to improve.  Among other things, Dr. Li cited Dr. Huang's "low and unacceptable productivity" with respect to publishing.  *Id.*  Notably, though, these complaints were absent from Dr. Huang's annual performance review for the period July 2007 through June 2008.  In fact, in that evaluation, Dr. Li graded Dr. Huang's research and publication as "commendable."  Pl.'s Mem. Opp'n Mot. Summ J., Ex. 16.

On September 16, 2008, Dr. Huang emailed Dr. Li, stating his desire to be the principal investigator ("PI"), or at least co-PI, on a National Institutes of Health ("NIH") grant resubmission.  Dr. Li declined via email, writing that Dr. Huang was "not there yet."  Pl.'s Mem. Opp'n Mot. Summ. J., Ex. 36.  Ultimately, Dr. Li listed Dr. Huang as a co-investigator, instead of co-PI, on this grant resubmission.

---

[2] It is worth noting that there is a significant difference between a research assistant professor appointment and a research support faculty appointment.  This significance, and its relevance to the instant matter, is discussed in the Faculty Senate Peer Review Panel report that I mention in greater depth later in this memorandum opinion:

> As stated in Dr. Huang's 2007 appointment letter, the Research Assistant Professor position involves developing an independent line of research and obtaining external funding.  Given this title, it is quite reasonable for Dr. Huang to have expected to become an independent researcher who would obtain grants and publish independently of his mentor, Dr. Li.  Dr. Li, however, seems to have expected Dr. Huang to remain in a subordinate position in his lab and to continue to work under his supervision.  Ellen Missana, [Director of Human Resources for the School of Medicine], confirmed that Dr. Huang received the wrong title.

Pl.'s Mem. Opp'n Mot. Summ. J., Ex. 23, at 1.

Later in September 2008, Dr. Huang submitted his own proposal for an NIH grant to fund a research project called "Functional Characterization of ANKK1 and its Genetic Variants" (the "ANKK1 grant").  Without Dr. Li's permission or knowledge, Dr. Huang listed himself as the sole PI and Dr. Li as a co-investigator in the budgeted personnel for the grant.  After learning of this conduct, Dr. Li wrote Dr. Huang a letter on October 10, 2008, informing him that such behavior was "unacceptable" and "unethical" and, should such misconduct recur, Dr. Huang would "face serious consequences up to and including termination."  Li Decl. ¶ 13.  However, Dr. Huang denies having ever received this letter.  On October 16, 2008, Dr. Huang emailed Dr. Li to apologize for the aforementioned conduct.  The next day, Dr. Li accepted Dr. Huang's apology.  Additionally, Dr. Li agreed that, in the event the NIH awarded the ANKK1 grant, he would serve as a co-investigator and permit Dr. Huang to utilize his laboratory to conduct the relevant research.  Ultimately, Dr. Johnson and the Department approved Dr. Huang's proposal for submission to the NIH.

On January 23, 2009, Dr. Huang met with Dr. Li and Dr. Johnson to discuss Dr. Huang's duties and expectations.  The next day, in advance of an evaluation that Dr. Huang was evidently about to have with Dr. Johnson, Dr. Li emailed the following to Dr. Johnson in reference to Dr. Huang:

> After your evaluation is over, we have to find way to take care of this issue.  He has been this way for a couple of years and I am so tired and feel hopeless for this situation.  He never show too much appreciation for whatever he gets.  He always think he is right and he deserves more and better.  I have been "back-up" so many times but I never see an end.  This is why I feel that, this time, I must keep my words and do not change my decision.  I know if I let him to win this one through you, he will have another one (which will destroy both of us).  I cannot be so nice anymore to him.  To be honest, I never see second person like him among more than 50 students, postdoctoral fellows and technicians who have been worked for me.  I wish I did not change his visa and let him go at that time.  But I never expect he becomes so 'selfish' and 'untrusted.'

Johnson Aff., Ex. B (quoted verbatim).

4

Eventually, in June 2009, the NIH approved the ANKK1 grant for a period to run from June 15, 2009 through February 28, 2011, with Dr. Huang serving as the principal investigator. Dr. Huang proposed to allocate 50% of his time, referred to as level of effort, to the ANKK1 grant, and he listed Dr. Li's supervisory effort as 5%.[3]   Additionally, it should be noted that, in his grant proposal, Dr. Huang had specified that two additional co-investigators would be recruited to assist with research.

In August 2009, Dr. Huang used a UVa-issued purchasing card to buy a $4,500 laptop computer for the purpose of conducting data analysis in furtherance of his grant research.  On August 26, 2009, Dr. Li told Dr. Huang via email to cancel the order because Dr. Huang had failed to comply with proper procedures in using the purchasing card as such and had not obtained permission to buy the laptop.  In his response, Dr. Huang wrote to Dr. Li:

> Since you do not allow me to recruit any person for my project, I have to do data analysis by myself in addition to doing bench works at the lab.  So I have to work day and night to catch up the progress as I proposed in my project.  As such, I think purchasing a qualified laptop workstation is appropriate and necessary to accomplish my project successfully.
>
> I was and am not aware that this purchasing is against any university purchasing regulation.  If you are aware of, please do let me know the detailed university policy so that I can follow.  Otherwise, I am afraid that I cannot cancel this order.

Pl.'s Mem. Opp'n Mot. Summ. J., Ex. 55 (quoted verbatim).

Dr. Li wrote back to Dr. Huang, stressing the necessity of obtaining approval before ordering such costly items, even if the money for the purchase comes out of one's grant funds. Initially, Dr. Huang further ignored instructions from Dr. Johnson and Gregory Benham ("Mr. Benham"), the Chief Operating Officer of the Department, to return the laptop and refund the money.  Eventually, though, on September 1, 2009, Dr. Huang emailed Mr. Benham, stating that

---

[3] The level of effort a researcher allocates to a particular project determines the percentage of the researcher's salary that can be withdrawn from that project's fund account.

he had apprised himself of the relevant purchasing guidelines.  Dr. Huang further represented that, had he been aware of these guidelines, he would not have purchased the laptop without approval.  The parties do not appear to dispute the fact that, around this time, Dr. Huang returned the laptop.

In his email to Mr. Benham on September 1, 2009, Dr. Huang raised the separate issue of the availability of monthly financial reports for the ANKK1 grant.  Dr Huang wrote: "By going through university policies about grant management these days, I happened to learn that the university requires timely review of expenditures occurring at least once a month.  However, till now I have not received any monthly expenditure review yet about my grant account."  Benham Aff., Ex. D.  Evidently, Dr. Huang inquired of Mr. Benham about this issue after having not received a response from Lisa Franco ("Ms. Franco"), the fiscal contact for grants in the Department, despite having emailed her on August 30, 2009.

On September 2, 2009, Dr. Huang again emailed Mr. Benham about the monthly reports.  Later that day, Mr. Benham responded, stating that the reports were being processed and that other questions regarding grant expenses should be directed to Dr. Li.  Dr. Huang replied to Mr. Benham on the night of September 2, insisting that, surely the reports for June and July should have already been prepared, and again requesting that they be provided to him.  Dr. Huang added: "As you know, I have the primary responsibility for the grant management.  If I cannot receive these monthly reviews promptly or if there is something wrong with them, I have to report promptly to the Department Chair, the [Office of Sponsored Programs] and/or the University Audit Department."  Pl.'s Mem. Opp'n Mot. Summ. J., Ex. 34.  At this point, Mr. Benham forwarded the email chain to Dr. Li.

The next day, September 3, 2009, Dr. Li wrote to Mr. Benham as follows:

> Can you call me such that we can look at this issue?  I know Lisa [Franco] will
> release the reports for July and August; if possible, please hold little bit.  I have
> concern to let this guy to know personal information.  This is the reason I did not
> support his application earlier.

*Id.* (quoted verbatim).  Thereafter, Mr. Benham wrote back, stating that he had asked Ms. Franco

to "hold things."  *Id.*  Dr. Li replied, copying Dr. Johnson on the email and stating:

> I talked with Huang today and it is clear that he wants to use all my lab space,
> instruments, and materials but does not want to share with me.  He even does not
> think he needs to discuss with me on what he is doing.  He thinks he is the boss
> and can do whatever he wants in my lab for his research because he has his own
> grant (although he used all data from my lab for his proposal; I even did not
> bother it).  I really cannot work under this situation.  It is time to do proper paper
> work and let him go.  Too much headache for me.

*Id.* (quoted verbatim).

The next day, September 4, 2009, Mr. Benham sent an email to Ellen Missana ("Ms.

Missana"), Director of Human Resources for UVa's School of Medicine, asking her for advice

on how to proceed with, as the subject of the email stated, an "Issue of Faculty Insubordination."

Benham Aff., Ex. E.  The content of Mr. Benham's email reveals that he wished to initiate a

discussion about terminating Dr. Huang's employment because of the resistance Dr. Huang had

displayed to the numerous directives instructing him to return the laptop.  Incidentally, the same

day, Dr. Huang emailed Dr. Johnson in order to express his as yet unaddressed concern regarding

receipt of the monthly financial reports for the grant.  Specifically, he wrote:

> By going through university policies about grant management, I learned that the
> university requires timely review of expenditures occurring at least once a month
> for the previous month's activity. . . . [T]ill now I have not yet received any
> monthly expenditure review.  I think this is sort of abnormal.  As the principal
> investigator of this research grant, I have the primary responsibility for the grant
> management according to the university policy.  So, I am writing you to report
> this issue.  I suspect that someone, not me, is controlling over my grant account,
> which is against the university regulation.  Could you please help me find out as
> soon as possible what is going on with my grant account?  Also, could you please
> advise me if I need report this issue as well to the Office of Sponsored Programs
> and/or the University Audit Department in case there is something fraudulent
> occurred in my grant account?

Pl.'s Mem. Opp'n Mot. Summ. J., Ex. 33 (quoted verbatim).  In his reply, Dr. Johnson suggested that Dr. Huang work with Mr. Benham in order to receive the reports.

Ms. Missana responded to Mr. Benham's email on September 23, 2009, stating her opinion that she, Mr. Benham, and Dr. Li should meet to agree on a plan of action.  According to Dr. Johnson and Mr. Benham, this group of individuals eventually decided that the best course of action would be to issue a notice of non-renewal to Dr. Huang.  However, neither Dr. Johnson nor Mr. Benham attests to precisely when this group came to that conclusion.

On September 29, 2009, Dr. Li emailed Dr. Huang to inform him that the monthly status reports were in his office.  "If you want to see, you come to my office to look at them and then bring them back," Dr. Li wrote.  Pl.'s Mem. Opp'n Mot. Summ. J., Ex. 35.  Dr. Huang eventually obtained the monthly reports for July and August 2009.  Upon reviewing them, he discovered that Dr. Li had changed the levels of effort charged to the ANKK1 grant without his authorization.  Specifically, Dr. Li had assigned 50% of the time of laboratory coordinator Nicole Gautier ("Ms. Gautier") to the ANKK1 grant, had increased his own level from 5% to 7.5%, and had increased Dr. Huang's level of effort from 50% to 75%.  However, these changes did not, according to Dr. Huang, reflect the work that was actually being conducted on the grant.  While Ms. Gautier generally provided services to the laboratory, she was not an investigator or researcher on the ANKK1 grant.  In fact, during her deposition testimony, she claimed not to have known that there was an ANKK1 grant at the time that Dr. Li was charging part of her salary to it.  According to Dr. Huang, the alterations allowed Dr. Li to devote his and Ms. Gautier's time to other research projects, yet draw money from the ANKK1 grant to pay unrelated salaries and expenses.  Further, these changes were unauthorized; Dr. Huang was the principal investigator with, as he has described it, "responsibility to allocate, alter, and approve

any level of effort charged to the project account," and yet he had not approved the changes. Am. Compl. ¶ 38.

According to Dr. Huang, because he believed that Dr. Li's actions represented a misappropriation of federal funds, he orally reported the unauthorized modifications to Dr. Johnson on October 12, 2009.  Dr. Johnson conceded in his deposition that he did speak with Dr. Huang about this issue on that date.  Dr. Huang claims that, although Dr. Johnson did not acknowledge that Dr. Li's actions were inappropriate or unlawful, Dr. Johnson did assure him that the changes would be readjusted and any money that had been withdrawn would be refunded.[4]

At this point, it should be noted that Dr. Huang's suspicions were fueled in part by conversations he had with a former research assistant professor at UVa, Xiang-Yang Lou ("Dr. Lou").  From 2005 to 2009, Dr. Lou was employed at UVa, and Dr. Li served as his mentor as well.  During his time at UVa, Dr. Lou was also a principal investigator on an NIH-sponsored grant.  According to Dr. Lou, when he reviewed his relinquishment statement and the monthly status reports for his grant, he noticed that somebody had assigned levels of effort to Ms. Gautier even though she did not work on his grant.  In a declaration, Dr. Lou states his belief that Dr. Li was behind this and other misallocations.  In fact, Dr. Lou contacted Dr. Li to discuss, among other things, these misallocations:

> In response to asking about the funds Dr. Li became irritated with me and hung up the phone before our conversation was concluded.  After speaking with Dr. Li about the misallocation of funds I felt intimidated by Dr. Li's implied negativity. Dr. Li's tone and volume made it clear to me that he did not want to discuss the topic of the funds.  Further attempts to speak with Dr. Li resulted in hung up phone calls.

---

[4] According to Dr. Huang, throughout the remainder of his employment at UVa, the withdrawn money was never entirely refunded.  In response to requests for admission propounded by Dr. Huang, Defendants admit that the "ultimate disposition of [Ms.] Gautier's salary was not achieved until the final review of the ANKK1 grant by the University Director of Research Administration on May 9, 2011."  Pl.'s Mem. Opp'n Mot. Summ. J., Ex. 38, at 6.

Pl.'s Mem. Opp'n Mot. Summ. J., Ex. 29.  Evidently, Dr. Lou communicated his experience with Dr. Li to Dr. Huang in August 2009, just before Dr. Huang began inquiring about the availability of the monthly reports.

On October 23, 2009, Dr. Huang certified Ms. Gautier's level of effort as 0% on her effort report for the period April 2009 through June 2009 because she had not performed any work on the ANKK1 grant and Dr. Huang had not approved her assignment to the grant. However, Dr. Huang's certification was rejected.  On October 30, 2009, Dr. Johnson drafted a letter to Dr. Li and Dr. Huang in which he summarized his review of "the issues raised with respect to the conduct of your respective grants and the lines of authority within the section." Pl.'s Mem. Opp'n Mot. Summ. J., Ex. 56.  In doing so, Dr. Johnson listed nine steps to serve as a resolution.  Notably, this draft letter did not include any reference to Dr. Huang's termination or non-renewal.

On November 20, 2009, Dr. Huang received a notice of non-renewal from Dr. Johnson and the dean of the School of Medicine, informing him that UVa would not be renewing his employment contract and that his appointment would end one year later on November 19, 2010. The notice stated: "This intended decision is based upon the development of serious issues concerning your professional relationships with your supervisor, Dr. Li.  These issues have negatively impacted Dr. Li's assessment of your performance in your position."  Pl.'s Mem. Opp'n Mot. Summ. J., Ex. 31.  The notice of non-renewal was also accompanied by eight terms intended to govern the remaining year of Dr. Huang's employment in the Department. According to Defendants, one of the central purposes of implementing these terms was to ensure that, while Dr. Huang remained employed by UVa, his time could be spent productively on his

research endeavors.[5] However, according to Dr. Huang, these terms ultimately restricted his ability to conduct research and effectively breached Defendants' commitment to the NIH to provide him resources and adequate space necessary to complete his grant work.[6]

On January 29, 2010, Dr. Huang certified Ms. Gautier's level of effort for the period July 2009 through September 2009 as 0%, noting on the report that she "had nothing to do with this project." Pl.'s Mem. Opp'n Mot. Summ. J, Ex.43. However, Dr. Huang claims that his certification of her effort as such was again rejected.

On February 18, 2010, Dr. Johnson wrote to Dr. Huang, informing him that he had been routinely failing to comply with the terms set forth in the non-renewal letter that governed the remainder of his employment. Specifically, the letter cited: (1) Dr. Huang's failure to provide Dr. Li with updates of his work every two weeks; (2) Dr. Huang's utilization of Dr. Li's laboratory supplies without permission; (3) Dr. Huang's use of Dr. Li's laboratory equipment without permission; and (4) Dr. Huang's failure to vacate his prior work space and move to a new work space. Dr. Johnson further communicated that Dr. Huang was "facing possible

---

[5] Paraphrased, the terms included the following:

1. Dr. Li and Ms. Gautier would be removed from the ANKK1 project;
2. Dr. Huang would assign all of his effort to the ANKK1 project;
3. Dr. Huang would provide Dr. Li with updates every two weeks on the work he was performing;
4. If Dr. Huang desired to develop any collaborative projects with Dr. Li, he would have to obtain consent in writing six months prior to submission of the project proposal. Dr. Huang would not be permitted to submit NIH grant proposals listing Dr. Li's laboratory as a resource without Dr. Li's consent;
5. All supplies for the ANKK1 project would be purchased with funds from the grant;
6. At least one week in advance, Dr. Huang would have to provide Dr. Li with a list of any equipment in Dr. Li's laboratory that he intended to use;
7. Dr. Huang would be assigned new working space; and
8. Dr. Wendy Lynch would become Dr. Huang's day-to-day supervisor.

*See* Johnson Aff., Ex. C.

[6] For example, Dr. Huang claims that, in December 2009, new locks were placed on Dr. Li's laboratory doors, thus preventing him from accessing equipment and facilities necessary for conducting research in accordance with the ANKK1 project. According to Dr. Huang, on or about December 17, 2009, he orally requested a key for these new locks. However, Dr. Huang was not provided with a key. Separately, Dr. Huang maintains that he was provided inadequate laboratory space that, in any event, was occupied at the time it was assigned to him.

disciplinary action up to and including termination," and he asked Dr. Huang to respond to the concerns outlined in the letter.  Johnson Aff., Ex. D.  However, Dr. Huang ignored Dr. Johnson's request for a response.  Instead, Dr. Huang filed a grievance with the Faculty Senate Grievance Committee ("FSGC") on February 23, 2010.  The FSGC accepted Dr. Huang's grievance for investigation on March 23, 2010.

On March 31, 2010, Dr. Johnson submitted a lengthy letter to the FSGC in which he described the history of Dr. Huang's employment with the Department as well as his and Dr. Li's interactions with Dr. Huang.  In addition to outlining the various issues that had arisen in the course of Dr. Huang's employment, Dr. Johnson noted at the end of the letter that, "during my counseling sessions with Dr. Huang, I have found him to be unresponsive to suggestions to correct his behavior and, at times, threatening and hostile."  Johnson Aff., Ex. E.

On May 11, 2010, Dr. Huang orally complained to UVa's ombudsman that he had been retaliated and discriminated against as a result of having reported Dr. Li's alleged misallocation of grant funds.[7]

While the FSGC's investigation was still pending, Sharon Hostler ("Dr. Hostler"), the Senior Associate Dean of the School of Medicine, wrote a letter to Dr. Huang, dated May 14, 2010, in which she notified him that the school was also investigating his employment situation and, accordingly, that he would be placed on administrative leave with pay, effective immediately.  Dr. Hostler informed Dr. Huang that he was facing termination of his employment for "lack of full compliance with all the issues stipulated in the initial letter of November 20, 2009 and the follow-up letter of February 18, 2010."  Pl.'s Mem. Opp'n Mot. Summ. J., Ex. 50, at 1.  In Appendix A to the letter, Dr. Hostler wrote:

---

[7] Dr. Huang followed up with a formal complaint letter that he emailed to the ombudsman on July 6, 2010.

> Your lack of compliance with the requested conditions and your open disagreement with the Psychiatry Department administration has led to fear among Psychiatry employees and has caused an interruption of daily work. This negative impact on the progression of work is not acceptable. You chose to ignore Professor Johnson's request for an explanation of your actions, and continued to violate the terms which you had agreed upon with Professor Johnson and Dr. Li that were outlined in the November 20, 2009 letter of non-renewal.

*Id.* at 2. After reiterating the four concerns identified by Dr. Johnson in the February 18, 2010 letter, which "remain the reason for your possible dismissal from your position," Dr. Hostler wrote:

> Additionally, your conduct previous to the notice of non-renewal is also of significant concern. Two examples are illustrative. First, your attempted representation of Dr. Li's data as your own was unacceptable. Second, your purchase of a computer without approval resulted in multiple verbal and written requests by Professor Johnson and Dr. Li to return the computer.

*Id.* at 3. It should be noted that, in a declaration, Dr. Huang disclaims ever using or misappropriating any unpublished data that belonged to Dr. Li on any grant application. On May 16, 2010, Dr. Huang wrote a response to Dr. Hostler's suspension letter in which he again raised the issue of Dr. Li's alleged misappropriation of grant funds.

Evidently, Dr. Hostler met with Dr. Huang on June 7, 2010 to discuss conditions that had been negotiated internally that would allow Dr. Huang to continue his research and bring his grant project to a close before his appointment expired. These conditions, which Dr. Hostler committed to writing in a June 10, 2010 letter to Dr. Huang, included, among other things:

- Ms. Gautier's level of effort on the grant would be reduced to 10% to reflect her purchasing duties and her role in lab management;

- Dr. Huang would be provided with new laboratory space;

- Dr. Huang's appointment would be extended until February 28, 2011, the end of the grant period, and would terminate thereafter, unless, by January 1, 2011, Dr. Huang requested an extension to complete his research; and

13

- The Department would provide Dr. Huang with a computer for use during the remainder of his appointment.

Dr. Hostler gave Dr. Huang until June 14, 2010 to provide written acceptance of these terms.

Before responding to Dr. Hostler, Dr. Huang inquired about the status of his FSGC grievance. In response, Robert Rood ("Mr. Rood"), Chairman of the FSGC, told Dr. Huang on June 11, 2010, that "[t]he conditions offered in [Dr. Hostler's letter] are far more generous to you than we anticipated . . . ." Huang Dep., Ex. 15. Mr. Rood continued, stating: "The FSGC can do nothing to extend your contract beyond the dates in that letter. You seem to think that your initial appointment as Research Assistant Professor had some implications for longterm employment with UVa. It does not." *Id.* Mr. Rood concluded by suggesting that Dr. Huang begin seeking employment elsewhere and noting that, if Dr. Huang did not accept the conditions, "they can move for immediate termination because you violated the procedures set forth in the November 20, 2009 letter. The fact that you disagreed with those conditions offers you no protection." *Id.*

On June 13, 2010, Dr. Huang filed a complaint with UVa Health System's Corporate Compliance & Privacy Office regarding Dr. Li's alleged misappropriation of grant funds and subsequent retaliation.

On June 14, 2010, Dr. Huang responded to Dr. Hostler per her request. As a result of his letter, Dr. Hostler amended the aforementioned conditions in a letter to Dr. Huang dated June 16, 2010. In her new letter, Dr. Hostler agreed to change Dr. Huang's assigned laboratory to one he requested. Additionally, Dr. Hostler represented that the Department would, for the pay periods from June 2009 through November 2009, remove all of Ms. Gautier's level of effort charges and charge Dr. Li 5% level of effort as budgeted. All other conditions of Dr. Hostler's June 10, 2010

14

letter were to remain the same, and she asked Dr. Huang to return a signed copy of the letter if he would agree to abide by them.

On June 17, 2010, Dr. Huang wrote to Dr. Hostler to inform her that, *inter alia*, he was rejecting the offered terms.  Accordingly, the following day, Dr. Hostler wrote a letter to Dr. Huang, informing him that the School of Medicine was recommending to the Provost of UVa that Dr. Huang's employment be terminated.  In her letter to the Provost, dated June 18, 2010, Dr. Hostler lists the charge against Dr. Huang as "unacceptable performance after due notice." Pl.'s Mem. Opp'n Mot. Summ. J., Ex. 23, at 3.  Upon the Provost's request, the Faculty Senate organized a Faculty Senate Peer Review Panel ("FSPRP") to review the proposed termination of Dr. Huang.

On August 25, 2010, the FSPRP issued an eleven-page report.  In the report, the FSPRP addressed Dr. Huang's failure to comply with the conditions set forth in the letter of non-renewal:

> Due to the particular circumstances of this case, however, we believe that failure to follow those directives does not justify termination.  The conditions in the non-renewal letter gave Dr. Li complete discretion over whether and when Dr. Huang could use his lab and equipment.  The conditions forbade Dr. Huang from using Dr. Li's lab without prior permission and required Dr. Huang to give Dr. Li advance notice before using any of his major equipment.  In an e-mail to Dr. Huang dated December 22, 2009, Dr. Johnson interpreted this advance notice provision to mean that Dr. Huang had to get Dr. Li's permission to use the equipment as well.  There was no pre-approved schedule or time allocation for Dr. Huang in Dr. Li's lab stated in the November 20 letter.  Apparently, then, Dr. Li could deny Dr. Huang access to his lab and its equipment at any time and for any reason.

> Given Dr. Huang's allegations against Dr. Li, it is troubling that the November 20 directives placed Dr. Li in control of Dr. Huang's access to essential resources. More troubling still, the non-renewal letter also continued to give Dr. Li a supervisory role over Dr. Huang, by requiring Dr. Li to co-sign Dr. Huang's evaluations.  It is one thing to say that a faculty member must comply with administrative directives even when the faculty member is challenging those directives.  It is quite another thing to extend that principle to situations in which

the directives themselves give discretionary authority to the very position the complaining faculty member has accused of wrongdoing.

Pl.'s Mem. Opp'n Mot. Summ. J., Ex. 23, at 6.  Additionally, the FSPRP found that

> *a reasonable person in Dr. Huang's position could have concluded that the actions of the School of Medicine in response to his allegations were retaliatory.* In the first place, Dr. Huang did not get in the November 20 letter, and has not gotten since, a clear determination of whether his allegations are correct or not. The November 20 letter simply states that "Professor Li and Ms. Nicky [Gautier] will be removed from [Dr. Huang's ANKK1] grant, starting on November 20, 2009."  That is not an admission that the charges were improper; nor is it a rejection of Dr. Huang's claim.  Instead, it sidesteps the issue of whether the charges were improper and imposes a compromise solution (no charges at all for Dr. Li or Ms. [Gautier], but only going forward).  But Dr. Huang claims he never agreed to this compromise (a claim supported by the language of the November 20 letter . . . ), and in any case if Dr. Huang's allegations are correct, the compromise leaves in place illegitimate and perhaps illegal cost allocations for a period of several months.

*Id.* at 8 (emphasis added).  The report concluded as follows:

> Although we do not condone Dr. Huang's failure to comply with the terms of the November 20 non-renewal letter, we believe that the continual failure of the Department of Psychiatry and the School of Medicine to respond to and resolve Dr. Huang's allegations concerning the cost allocations puts the November 20 non-renewal letter, and its restrictive conditions, in a different light.  In our view, *the possibility that Dr. Huang's non-renewal was at least in part an act of retaliation cannot be ruled out definitively.*  Moreover, it was inappropriate to give any discretionary role to Dr. Li while Dr. Huang's allegations against him were pending.  Therefore, we believe the University has not met its burden in justifying termination based on Dr. Huang's failure to comply with the November 20 conditions.

*Id.* at 10 (emphasis added).  Finally, the report ended with an unsolicited recommendation that

the School of Medicine make every effort to enable Dr. Huang to complete his grant.

Upon reviewing the FSPRP report, the FSGC submitted its final report to the President of

UVa on September 3, 2010.  The FSGC report discussed the allocation of levels of effort for the

ANKK1 grant:

> Concerning Dr. Li's salary, it is common practice to charge different amounts to a grant in different months.  The key factor is that over the life of the grant the budgeted amount equal to the actual expenditure.  As to the technician's salary

16

> charged, Dr. Johnson has informed us that the various grant holders working in Dr. Li's lab, contribute to the shared expenses of the lab. Maybe 50% of the technician's salary was inappropriately large, but having Dr. Huang contribute something to the common operation is reasonable. In any case, the excess in Dr. Li's salary and the technician's salary were to be refunded to Dr. Huang's grant.

Pl.'s Mem. Opp'n Mot. Summ. J., Ex. 21. The report continued, observing that, "according to University policy, PIs are responsible for ensuring that funds on research grants are properly allocated for their intended purpose. The fact that, in these instances, funds were apparently allocated without the knowledge or approval of the PI represents a serious breach of University policy." *Id.* With regard to Dr. Huang, the FSGC stated: "We feel that he has been poorly treated, in particular, he appears to have been poorly mentored." *Id.* Among others, the report offered the following conclusions:

> [Dr. Huang]'s charge that Dr. Li misused his grant funds was probably the precipitating event for the November 20, 2009 non-renewal letter. However, it is clear that relations between Dr. Li and [Dr. Huang] had become progressively worse ever since [Dr. Huang]'s appointment as Research Assistant Professor. It appears unlikely that [Dr. Huang]'s appointment would have been renewed in any case. . . .
>
> Procedures were imposed in November 2009 that limited Dr. Huang's access to laboratory facilities thereby severely constraining his ability to conduct a funded research project for which those facilities were committed.
>
> Subsequent efforts made by the [School of Medicine] in June, six months after the non-renewal letter, to allow [Dr. Huang] to fulfill the contracted research appear to be laudable. The FSGC recommended that [Dr. Huang] accept the [School of Medicine]'s offer. He declined.

*Id.* Ultimately, the Provost permitted Dr. Huang to remain on administrative leave through November 2010 when his original, non-renewed term of employment was set to expire.

However, Dr. Huang sought a more definitive resolution of his complaints. On September 21, 2010, Dr. Huang emailed the Provost. After hearing nothing from the Provost, Dr. Huang wrote to the President, the Executive Vice President and Chief Operating Officer, and the Provost on October 4, 2010, asking for a final decision with respect to his grievance. Again,

Dr. Huang heard nothing.  On October 31, 2010, he filed a grievance appeal with UVa's Board of Visitors.

On November 17, 2010, Dr. Johnson made a last-ditch offer to extend Dr. Huang's employment contract by one year.  Moreover, Dr. Johnson pledged to cooperate in assisting Dr. Huang in getting the ANKK1 grant extended.  Because UVa had not conclusively addressed Dr. Li's conduct or whether the actions taken against him were retaliatory, and in light of the fact that his grievance appeal was still pending, Dr. Huang declined Dr. Johnson's employment extension offer on November 19, 2010, fearing that, if he did so, further retaliation would ensue. On November 22, 2010, Dr. Huang wrote a letter to the Secretary of UVa's Board of Visitors in which he outlined the foregoing reasons for declining to sign the one-year extension offer.

At an unspecified point in November 2010, UVa's President directed the university's Audit Department to conduct a review of the grant funds expended on the ANKK1 grant, including issues related to Dr. Huang's allegations of level-of-effort misallocation.  On January 12, 2011, the Audi Department issued its report.  According to the report, Dr. Li's salary was originally charged to the ANKK1 grant at 7.5%; however, these charges were discontinued midway through the grant's first year, resulting in Dr. Li being charged at 4.75% for the initial year of the award.  Further, Dr. Huang removed Dr. Li from the grant for the second year, and so none of Dr. Li's salary was charged to the grant for its second year.  The report concluded as follows: "A limited review of all other charges on the award was performed and nothing of significant concern was identified, other than Dr. Huang's continued salary charges when he went on leave."  Reid Dep., Ex. A.

On December 7, 2010, Dr. Huang, who by this point was no longer employed by UVa, filed a report alleging grant fraud with the Office of the Inspector General at the United States

Department of Health and Human Services.  Thereafter, on February 28, 2011, Dr. Huang sent an email to the NIH and copied Stewart Craig ("Mr. Craig"), Assistant Dean and Director of the School of Medicine's Office of Grants and Contracts.[8]  In the email, Dr. Huang wrote that he had been "maliciously retaliated and discriminated against by non-renewal for my faithful reporting of my mentor, Dr. Ming D. Li, making fraudulent effort reports in my grant."  Craig Aff., Ex. A.[9]  On March 1, 2011, Mr. Craig sent a reply email to the NIH in which he explained that the allegations asserted by Dr. Huang, who was no longer employed by UVa,

> were raised by Dr. Huang, repeatedly, throughout the period of his administrative leave and his appeals process.  These allegations were taken very seriously by the University of Virginia and were thoroughly investigated.  Based upon the result of this investigation, the University of Virginia concluded that there is no factual support for the allegations and that the allegations are therefore without substance.

Craig Aff., Ex. B.

In May 2011, UVa closed out the ANKK1 grant.  According to Mr. Craig, as of the date on which he swore out his affidavit, there has not been "any inquiry, expression of concern, or investigation by NIH into Dr. Huang's allegations of 'fraudulent effort reports' . . . ."  Craig Aff. ¶ 10.

---

[8] On or about February 28, 2011, the Board of Visitors declined to grant Dr. Huang's grievance appeal.

[9] With respect to Dr. Huang's allegations of fraudulent reporting, Mr. Craig stated the following in his affidavit:

> In my experience lab managers such as Ms. Gautier can be designated to purchase supplies and provide administrative support on multiple grants so it did not strike me as strange that she had been assigned a level of effort on the startup of the ANKK1 Grant.  Nonetheless, I knew that [Office of Sponsored Program]'s position on levels of effort was that it was the PI who ultimately made the decision on what levels of effort were accurate.  In the case of Dr. Huang's complaint, Ms. Gautier and Dr. Li were ultimately removed entirely from the ANKK1 Grant and thus awarded 0% levels of effort.

Craig Aff. ¶ 4.

## II. Legal Standard

Summary judgment should be granted if the pleadings, the discovery and disclosure materials on file, and any affidavits show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  If the evidence of a genuine issue of material fact "is merely colorable or is not significantly probative, summary judgment may be granted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50 (1986) (citations omitted).  "As to materiality . . . [o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* at 248.

In considering a motion for summary judgment under Rule 56, a court must view the record as a whole and draw all reasonable inferences in the light most favorable to the nonmoving party.  *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).  If the nonmoving party bears the burden of proof, "the burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325.  If the moving party shows such an absence of evidence, the burden shifts to the nonmoving party to set forth specific facts illustrating genuine issues for trial.  *See* Fed. R. Civ. P. 56(c); *Celotex*, 477 U.S. at 324. The trial court has an "affirmative obligation" to "prevent 'factually unsupported claims [or] defenses' from proceeding to trial." *Felty v. Graves-Humphreys Co.*, 818 F.2d 1126, 1128 (4th Cir. 1987) (quoting *Celotex*, 477 U.S. at 323–24).

# III. Discussion

## A. 42 U.S.C. § 1983 and the First Amendment

Dr. Huang brings a claim under 42 U.S.C. § 1983 against Dr. Li and Dr. Johnson, in both their individual and official capacities, for violating his free speech rights as secured by the First Amendment to the Constitution.[10]   Specifically, Dr. Huang contends that, when he reported Dr. Li's alleged misappropriation of public grant funds, he exercised his First Amendment rights. Further, Dr. Huang maintains that Defendants retaliated against him for doing so by issuing the non-renewal letter.  According to Dr. Huang, he made the statements regarding the grant funds as a private citizen, not as the principal investigator on the ANKK1 grant, because at the time he came forward, he had effectively been removed as such by Defendants' "abuse of power."  Am. Compl. ¶ 95.

At the outset, I note that the First Amendment protects "not only the affirmative right to speak, but also the 'right to be free from retaliation by a public official for the exercise of that right.'"  *Adams v. Trs. of the Univ. of N.C.-Wilmington*, 640 F.3d 550, 560 (4th Cir. 2011) (quoting *Suarez Corp. Indus. v. McGraw*, 202 F.3d 676, 685 (4th Cir. 2000)).  And it is well-established that "public employees do not surrender all their First Amendment rights by reason of their employment.  Rather, the First Amendment protects a public employee's right, in certain circumstances, to speak as a citizen addressing matters of public concern."  *Garcetti v. Ceballos*, 547 U.S. 410, 417 (2006) (citations omitted); *accord McVey v. Stacy*, 157 F.3d 271, 277 (4th Cir. 1998) ("The First Amendment protects public employees from termination of their employment in retaliation for their exercise of speech on matters of public concern.").  Clearly, though, this

---

[10] Section 1983 permits suits for violations of civil rights in those instances in which the violator acts under color of state law.  *See Jenkins v. Medford*, 119 F.3d 1156, 1159–60 (4th Cir. 1997) ("Under [ ] § 1983, a plaintiff must establish three elements to state a cause of action: (1) the deprivation of a right secured by the Constitution or a federal statute; (2) by a person; (3) acting under color of state law.").

right is not limitless.  *See McVey*, 157 F.3d at 277 ("[T]his First Amendment protection of speech on matters of public concern is not absolute and must be tempered by the government's interest in governmental effectiveness, efficiency, order, and the avoidance of disruption.").

In *Pickering v. Board of Education of Township High School District 205*, 391 U.S. 563 (1968) and its progeny, the Supreme Court of the United States identified two lines of inquiry to guide courts in the interpretation of the constitutional protections afforded to the speech of public employees.  *Garcetti*, 547 U.S. at 418.  The first question is "whether the employee spoke as a citizen on a matter of public concern."  *Id.* (citing *Pickering*, 391 U.S. at 568).  If the employee did not, he is precluded from pursuing a cause of action for violation of his First Amendment rights.  *Id.* (citing *Connick v. Myers*, 461 U.S. 138, 147 (1983)).  However, if the employee did speak as a citizen on a matter of public concern, the question becomes "whether the relevant government entity had an adequate justification for treating the employee differently from any other member of the general public."  *Id.* (citing *Pickering*, 391 U.S. at 568).

"[T]o determine whether a public employee has stated a claim under the First Amendment for retaliatory discharge,"[11] the United States Court of Appeals for the Fourth Circuit has stated that a court must determine the following:

> (1) whether the public employee was speaking as a citizen upon a matter of public concern or as an employee about a matter of personal interest; (2) whether the employee's interest in speaking upon the matter of public concern outweighed the government's interest in providing effective and efficient services to the public; and (3) whether the employee's speech was a substantial factor in the employee's termination decision.

---

[11] I observe that, "[w]ith regard to the retaliation claim, a public employer contravenes a public employee's First Amendment rights when it discharges or 'refuses to rehire [the] employee,' or when it makes decisions relating to 'promotion, transfer, recall, and hiring based on the exercise of' that employee's free speech rights."  *Ridpath v. Bd. of Governors Marshall Univ.*, 447 F.3d 292, 316 (4th Cir. 2006) (quoting *Suarez Corp. Indus. v. McGraw*, 202 F.3d 676, 686 (4th Cir. 2000)).  Thus, "a public employee need not have a protected property interest in his employment to state a retaliation claim."  *Ridpath*, 447 F.3d at 316.

*McVey*, 157 F.3d at 277–78; *see also Ridpath v. Bd. of Governors Marshall Univ.*, 447 F.3d 292, 316 n.26 (4th Cir. 2006) ("The *McVey* test fleshes out the balancing test first articulated by the Supreme Court in [*Pickering*], and further explained in later decisions."). Thus, the first inquiry here is whether Dr. Huang was speaking as a citizen on a matter of public concern when he voiced his suspicions about what he perceived as fraudulent allocations of levels of effort. I will examine the two prongs of this inquiry separately.

### 1. Capacity in which Dr. Huang Spoke

The first question is whether Dr. Huang was speaking as a citizen or in his capacity as an employee of UVa. *See Bevis v. Bethune*, 232 F. App'x 212, 215 (4th Cir. 2007) ("'Because almost anything that occurs within a public [entity] *could* be of concern to the public,' the focus of our inquiry is on 'whether the speech at issue . . . was made primarily in the plaintiff's role as citizen or primarily in his role as employee.'" (quoting *DiMeglio v. Haines*, 45 F.3d 790, 805 (4th Cir. 1995)). The Supreme Court has held that, "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Garcetti*, 547 U.S. at 421.[12] In this vein, the Court further explained that "the First Amendment does not prohibit managerial discipline based on an employee's expressions made pursuant to official responsibilities," because when an employee speaks in such a capacity, "there is no relevant analogue to speech by citizens who are not governmental employees." *Id.* at

---

[12] It is worth noting that the Supreme Court of the United States left open the question of whether its central holding in *Garcetti* applies in the context of academia, where issues of scholarship or teaching are implicated. *See, e.g., Lee v. York Cnty. Sch. Div.*, 484 F.3d 687, 694 n.11 (4th Cir. 2007) (observing the fact that the Supreme Court explicitly declined to decide whether its *Garcetti* analysis would apply in this context). Although the instant matter tangentially relates to academia, it does not represent an instance in which *Garcetti* is inapplicable. To be sure, Dr. Huang's speech was connected to his scholarship in the sense that the ANKK1 grant was integral to his research (and presumably a future publication). However, his speech did not concern the articulation of new or controversial ideas, nor could it reasonably be described as an exercise of so-called "academic freedom." Rather, at bottom, Dr. Huang spoke about an administrative issue that happened to take place in an academic setting by virtue of his dual position as a researcher and a member of the School of Medicine's faculty.

424. Consequently, while "[e]xposing governmental inefficiency and misconduct is a matter of considerable significance . . . [t]he dictates of sound judgment are reinforced by the powerful network of legislative enactments—such as whistle-blower protection laws and labor codes— available to those who seek to expose wrongdoing." *Id.* at 425. In *Garcetti*, the Court acknowledged the fact that formal job descriptions "often bear little resemblance to the duties an employee actually is expected to perform, and the listing of a given task in an employee's written job description is neither necessary nor sufficient to demonstrate that conducting the task is within the scope of the employee's professional duties for First Amendment purposes." *Id.* at 424–25. Accordingly, "[t]he proper inquiry is a practical one." *Id.* at 424.

In his amended complaint, Dr. Huang admits that, as the principal investigator on the ANKK1 grant, "it was his responsibility to allocate, alter, and approve any level of effort charged to the project account." Am. Compl. ¶ 38. Further, the NIH Grants Policy Statement furnished to Defendants by Dr. Huang describes the principal investigator as being "responsible and accountable to the grantee and NIH for the proper conduct of the project or activity" and "responsible for ensuring compliance with the financial and administrative aspects of the award." National Institutes of Health, *NIH Grants Policy Statement*, 13, 18 (rev. Dec. 1, 2003), *available at* http://grants.nih.gov/grants/policy/nihgps_2003/nihgps_2003.pdf. Defendants argue that Dr. Huang assumed the role of principal investigator on the ANKK1 grant in his capacity as an employee of UVa, and that one of his responsibilities as such was necessarily to report suspected level-of-effort misallocation. When he did so, Defendants maintain, he executed one of his official duties, thus precluding his speech from First Amendment protection. Accordingly, Defendants contend that they are entitled to summary judgment with respect to Dr. Huang's § 1983 claims.

In response, Dr. Huang argues that he had no legal duty to tell Dr. Johnson about Dr. Li's suspected misallocation of federal grant funds.  As a tenure ineligible research faculty member, Dr. Huang asserts that his duties involved laboratory research and scholarship, not uncovering and reporting suspected fraud.  According to Dr. Huang, the only entity that he was obligated to report to was the NIH, and yet he is suing Defendants for their response to statements he made to them, not to the NIH.   In other words, Dr. Huang maintains that he was only a principal investigator vis-à-vis the NIH, and not as it concerned his relationship to UVa and Defendants.

Ultimately, I find Dr. Huang's argument in this regard unpersuasive, and I agree with Defendants' assertion that Dr. Huang was speaking in the course of his official duties.  First, as previously quoted, the NIH's policy statement for grants makes it clear that principal investigators on NIH grants are accountable not just to the NIH, but to the grantee as well.  The policy statement explains that "[t]he term 'grantee' generally is used to refer to recipients of grants . . . ."  National Institutes of Health, *NIH Grants Policy Statement*, iii (rev. Dec. 1, 2003), *available at* http://grants.nih.gov/grants/policy/nihgps_2003/nihgps_2003.pdf.   According to Defendants, "[a]ll grants, whether awarded by the NIH or otherwise, are awarded to the University, not to individuals such as [Dr. Huang]."  Defs.' Rep. Mem. Supp. Mot. Summ. J., at 14.  Indeed, the ANKK1 grant itself corroborates this contention, for it clearly states that it is awarded from the NIH to UVa.  *See* Pl.'s Mem. Opp'n Mot. Summ. J., Ex. 26.  Thus, Dr. Huang's assertion that his only duties as principal investigator on the ANKK1 grant were owed solely to the NIH is belied by the NIH's policies and the very language of the grant itself.

Second, Dr. Huang's argument that he could not have been speaking pursuant to any official duties because he was not hired to uncover and report fraud is tenuous.  Even assuming, *arguendo*, that Dr. Huang was not explicitly required to report suspicions regarding the

allocation of levels of effort, the Fourth Circuit has stated that the absence of such a requirement cannot be dispositive.  *See Bevis*, 232 F. App'x at 215.  Moreover, as a fundamental matter, it simply cannot be the case that all public employees who reveal their suspicions regarding the misappropriation of funds, but who are not employed as auditors, investigators, or their equivalents, are necessarily speaking as private citizens when they come forward.  Such a blanket rule would not only defy reason—for surely some public employees who report allegations of fraud to their immediate supervisors are, in fact, merely speaking in their capacities as employees—but it would also contravene the Supreme Court's instruction that the proper inquiry to be conducted here is a practical one.  *Garcetti*, 547 U.S. at 424.[13]

Looking to relevant case law outside the Fourth Circuit, I observe that, in *Renken v. Gregory*, 541 F.3d 769 (7th Cir. 2008), the United States Court of Appeals for the Seventh Circuit confronted facts analogous to those presented by the instant matter.  In that case, a tenured engineering professor at a public university submitted a grant proposal to the National Science Foundation ("NSF") in which he listed himself as the principal investigator.  *Id.* at 770–71.  Subsequent to the university's approval of the grant proposal, the professor received correspondence from the dean of the engineering school regarding conditions tied to the university's matching of funds for the grant project.  *Id.* at 771.  In his response letter to the dean, the professor criticized several aspects of the dean's proposal.  *Id.*  Of particular note was the professor's contention that the dean's proposal would breach NSF regulations regarding the matching of funds.  *Id.*  Thereafter, tensions mounted, and although the professor lodged

---

[13] Defendants point out that other aspects of Dr. Huang's speech support a finding that it was undertaken pursuant to his official duties.  For instance, unlike the public school teacher in *Pickering* who expressed her concerns publicly by writing a letter to a local newspaper, 391 U.S. at 566, Dr. Huang voiced his suspicions regarding the allocation of grant funds internally.  Additionally, Defendants note that Dr. Huang's speech related to the subject matter of his employment—that is, research in the laboratory setting.  However, in *Garcetti*, the Supreme Court specifically observed that neither of these indicia, while perhaps relevant, can be considered dispositive.  547 U.S. at 420–21. Thus, while both of the aforementioned qualities of Dr. Huang's speech undoubtedly buttress my conclusion that Dr. Huang was speaking in his capacity as a government employee, neither one is wholly determinative.

complaints with various university individuals and entities, the grant funds were returned to the NSF.  *Id.* at 772–73.

In arguing that his complaints about potential grant fund misuse were not conveyed pursuant to his official duties, the professor raised two points.  First, he pointed to the fact that his job responsibilities only included teaching, research, and service to the university.  *Id.* at 773.  Second, he argued that his speech took place outside the context of his employment because it was only by the terms of the grant, not his job, that he was required to complain about the dean's proposal with respect to the funds.  *Id.* at 774.  However, these arguments failed to persuade the Seventh Circuit:

> [The professor] called attention to fund misuse relating to a project that he was in charge of administering as a University faculty members [sic].  In so doing, [the professor] was speaking as a faculty employee, and not as a private citizen, because administering the grant as a PI fell within the teaching and service duties that he was employed to perform.

*Id.*  Further, the court noted that, "whether [the professor] was explicitly required to apply for grants does not address whether his efforts related to the grant, including his complaints, were a means to fulfill his employment requirements, namely teaching and research."  *Id.*  Similarly, in the case at hand, while Dr. Huang's employment may not have required him to submit grant proposals in which he listed himself as the principal investigator, it is clear that his decision to do so with respect to the ANKK1 grant was a means towards fulfilling the research and publication goals that he was employed to pursue.

Another particularly instructive case is *Kalderon v. Finkelstein*, No. 08 Civ. 9440, 2010 U.S. Dist. LEXIS 88099 (S.D.N.Y. Mar. 10, 2010).  In *Kalderon*, a biomedical research scientist employed by a university as the principal investigator on an NIH grant alleged retaliation for speaking out about what she perceived as the mishandling of grant funds.  *Id.* at *60–62.  The magistrate judge concluded that her complaints about the grant's mismanagement were made

pursuant to her official duties vis-à-vis the NIH grant. *Id.* at \*63. As such, "her statements have no analogue to citizen speech, and, thus, are not protected by the First Amendment." *Id.* (citation and internal quotation marks omitted).[14] Other courts have come to the same conclusion under similar factual scenarios. *See, e.g.*, *Casey v. W. Las Vegas Indep. Sch. Dist.*, 473 F.3d 1323, 1329 (10th Cir. 2007) (concluding that a school superintendent's complaints to other school officials about the administration of Head Start funds were launched in the course of carrying out her official responsibilities and were, as a consequence, ineligible for First Amendment protection); *Battle v. Bd. of Regents*, 468 F.3d 755, 761–62 (11th Cir. 2006) (holding that a university employee's report of alleged improprieties with respect to her supervisor's handling of federal financial aid funds constituted official speech and could not be insulated from retaliation by the First Amendment).

At bottom, the inquiry here boils down to an examination of the capacity in which Dr. Huang communicated his speech to Dr. Johnson—was Dr. Huang acting as a government employee, or as a private citizen? When a public employee speaks as the latter, the First Amendment affords a degree of protection to his speech, for employment by a governmental entity does not vitiate "the prospect of constitutional protection for [one's] contributions to the civic discourse." *Garcetti*, 547 U.S. at 422. In the instant matter, however, it stretches reason to label Dr. Huang's discussion with Dr. Johnson about grant fund allocation as a contribution to the collective civic dialogue of the community in the way that, say, writing a letter to the editor, *see Pickering*, 391 U.S. 563, or debating politics with a co-worker, *see Rankin v. McPherson*, 483 U.S. 378 (1987), plainly would be. What is more, the complaints that Dr. Huang voiced, and which he alleges constituted the impetus for Defendants' retaliation against him, have no

---

[14] The district court accepted this portion of the magistrate judge's report and recommendation. *See Kalderon v. Finkelstein*, No. 08 Civ. 9440, 2010 U.S. Dist. LEXIS 88036, at \*5–6 (S.D.N.Y. Aug. 24, 2010).

analogue to citizen speech.  Therefore, I find that Dr. Huang reported his suspicions about the misappropriation of grant funds in the course of his official duties and in his role as an employee of UVa.  For that reason alone, Dr. Huang's speech cannot be insulated from discipline by the First Amendment.  However, even if I were to assume, *arguendo*, that Dr. Huang spoke as a citizen and not as a government employee, I would still arrive at the same conclusion regarding his § 1983 claims, for the content of Dr. Huang's speech did not constitute a matter of public concern for purposes of the First Amendment.

## 2. Importance to the Public of Dr. Huang's Speech

An employee speaks about a matter of public concern when he addresses "an issue of social, political, or other interest to a community."  *Urofsky v. Gilmore*, 216 F.3d 401, 406–07 (4th Cir. 2000).  "While '[t]he inquiry into the protected status of speech is one of law, not fact,' such status 'must be determined by the content, form, and context of a given statement, as revealed by the whole record.'"  *Ridpath*, 447 F.3d at 316–17 (quoting *Connick*, 461 U.S. at 147–48 & n.7).  The basis of Dr. Huang's assertion that his speech concerned a matter of public importance is essentially his contention that speech relating to public corruption is a matter of public concern per se.  It is true that the Supreme Court has highlighted the revelation of government wrongdoing as an especially noteworthy example of a matter about which the public is rightly concerned.  *See, e.g.*, *Garcetti*, 547 U.S. at 425 ("Exposing governmental inefficiency and misconduct is a matter of considerable significance."); *Connick*, 461 U.S. at 148 (citing an effort "to bring to light actual or potential wrongdoing or breach of public trust" as indicative of a matter of public concern).  However, in the case at hand, to label what Dr. Li allegedly did by manipulating the levels of effort on the ANKK1 grant as "public corruption" over-exaggerates

29

the severity of what Dr. Huang purports actually took place.   Therefore, Dr. Huang's speech cannot automatically be deemed to have been communicated about a matter of public concern.

In *Edwards v. City of Goldsboro*, 178 F.3d 231, 247 (4th Cir. 1999), the Fourth Circuit stated that whether a public employee's speech relates to a matter of public concern "rests on whether the public or the community is likely to be truly concerned with or interested in the particular expression, or whether it is more properly viewed as essentially a private matter between employer and employee."   This test is in accordance with the Supreme Court's more recent observation that "public concern is something that is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public at the time of [the speech]."   *City of San Diego v. Roe*, 543 U.S. 77, 83–84 (2004).

Applying these tests, I find that Dr. Huang's speech did not constitute a matter of public concern.   While the issue of level-of-effort allocation understandably represented a matter of significance to Dr. Huang, it simply cannot be said that the larger public would be truly concerned about Dr. Li increasing his level of effort by 2.5% or about the fact that Ms. Gautier, who performed tasks that benefited essentially everybody who worked in Dr. Li's laboratory, was receiving more of her salary from the ANKK1 grant funds than perhaps she should have been.   While the community might very well care about systemic fraud or the widespread misappropriation of federal funds across a university department, here, Dr. Huang's speech concerned allegations of level-of-effort misallocation over the course of a couple months in the management of a single NIH grant.   Ultimately, day-to-day matters of one grant's administration do not represent issues of public concern such that speech carried out in that context merits First Amendment protection.   Therefore, even assuming that Dr. Huang spoke as a citizen, I find that

he did not do so on a matter of public concern.[15]   Consequently, even if Defendants retaliated against him in part for having spoken about the misallocation of levels of effort, they did not violate Dr. Huang's constitutional rights in the process.   Accordingly, Defendants are entitled to summary judgment on Dr. Huang's § 1983 claims.

## B. False Claims Act

Dr. Huang has also brought a claim against Dr. Li and Dr. Johnson in both their individual and official capacities for retaliating against him in violation of the FCA.   According to Dr. Huang, by inappropriately assigning levels of effort, Dr. Li over-exaggerated the amount of work that was being done on the ANKK1 grant.   Dr. Huang further alleges that the drawing of funds from the ANKK1 grant to pay Dr. Li's and Ms. Gautier's salaries represented false claims of federal funds.   By investigating how the levels of effort were being assigned, and then raising his concerns to UVa personnel and others, Dr. Huang maintains that he took lawful actions geared towards exposing Dr. Li's attempt to defraud the federal government.

"The FCA is a statutory scheme designed to discourage fraud against the federal government."   *Mann v. Heckler & Koch Def., Inc.*, 630 F.3d 338, 342 (4th Cir. 2010).   Its "cornerstone provision" bars "any person from presenting 'a false or fraudulent claim for payment or approval' to the United States."   *Id.* at 342–43 (quoting 31 U.S.C. § 3729(a)).   In 1986, Congress amended the FCA by adding an anti-retaliation provision to protect whistleblowers.   *See* False Claims Amendments Act, Pub. L. No. 99-562, § 4, 100 Stat. 3153, 3157–58 (1986).   This whistleblower provision, under which Dr. Huang brings his FCA claim

---

[15] Briefly, I note that, in support of their argument that Dr. Huang was not speaking about a matter of public concern, Defendants again point out the fact that Dr. Huang's initial reports were wholly internal—that is, he simply reported up the chain of command to Dr. Johnson, the Department chairman.   However, that fact bears more on the role Dr. Huang undertook when he reported his suspicions, and less on whether those suspicions constituted a matter of public concern.   Thus, the internal nature of Dr. Huang's complaints cannot, by itself, serve as a basis for a determination that he was not speaking on a matter of public concern.

against Defendants, is found at 31 U.S.C. § 3730(h), and its purpose is "to promote enforcement of the FCA by 'assur[ing] those who may be considering exposing fraud that they are legally protected from retaliatory acts.'"  *Mann*, 630 F.3d at 343 (quoting S. Rep. No. 99-345, at 34, *reprinted in* 1986 U.S.C.C.A.N. 5266, 5299).[16]

In order to prevail on a claim brought under § 3730(h), an employee must show that: "(1) he took acts in furtherance of a qui tam suit; (2) his employer knew of these acts; and (3) his employer [took adverse action against] him as a result of these acts."  *Zahodnick v. Int'l Bus. Machs. Corp.*, 135 F.3d 911, 914 (4th Cir. 1997).  However, it should be noted that an employee does not need to have necessarily filed a qui tam action in order to have engaged in protected activity.  *Eberhardt v. Integrated Design & Constr., Inc.*, 167 F.3d 861, 867 (4th Cir. 1999).  Rather, protected activity in this context encompasses steps taken "in furtherance of an action . . . filed or to be filed under this section."  31 U.S.C. § 3730(h).  This language "manifests Congress' intent to protect employees while they are collecting information about a possible

---

[16] In full, § 3730(h)(1) currently provides:

> Any employee, contractor, or agent shall be entitled to all relief necessary to make that employee, contractor, or agent whole, if that employee, contractor, or agent is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee, contractor, agent or associated others in furtherance of an action under this section or other efforts to stop 1 or more violations of this subchapter.

31 U.S.C. § 3730(h)(1) (2010).  Significantly, Congress amended this subsection in 2009, eliminating language that referred to potential defendants as "employers."  Pub. L. No. 111-21, § 4(d), 123 Stat. 1617, 1624 (2009).  In 2010, Congress again amended § 3730(h)(1), this time simply to clean up the language of the subsection.  Pub. L. 111-203, § 1079A(c)(1), 124 Stat. 1376, 2079 (2010).  As opposed to the 2009 amendment, the 2010 amendment did not materially change the meaning or breadth of § 3730(h)(1).  For purposes of resolving the motion presently before me, the 2009 amendment is important.  Prior to the 2009 amendment, plaintiffs could only file FCA retaliation claims against their employers.  In the instant matter, that would have meant Dr. Huang's individual-capacity claim against Defendants, and probably his official-capacity claim as well, would fail as a matter of law.  However, by eliminating the reference to "employers" as defendants in § 3730(h)(1), the 2009 amendment effectively left the universe of defendants undefined and wide-open.  Notably, the 2009 amendment applies to conduct on or after the date of enactment, which was May 20, 2009.  Pub. L. No. 111-21, § 4(f), 123 Stat. 1617, 1625 (2009).  Therefore, it is the 2009-amended version of § 3730(h)(1) that applies to the alleged retaliation in the case at hand.  In the absence of specific guidance from the United States Court of Appeals for the Fourth Circuit dictating that there can be no individual liability in FCA retaliation claims after the 2009 amendment, and because Defendants do not assert in their motion that Dr. Huang's FCA claims against them are legally impermissible, I will not dismiss those claims out of hand.  Instead, I proceed to the ordinary summary judgment analysis.

fraud, before they have put all the pieces of the puzzle together." *United States ex rel. Yesudian v. Howard Univ.*, 153 F.3d 731, 740 (D.C. Cir. 1998). I proceed to an analysis of the three elements of an FCA retaliation action as set forth in *Zahodnick*.

### 1. Protected Activity

The chief inquiry here is whether Dr. Huang's activity fell within the protected category under the FCA. If a reasonable jury could not find that it did, Defendants are entitled to summary judgment in their favor with respect to Dr. Huang's FCA claims. As the Fourth Circuit has put it, "employees engage in protected activity when they meet what has been called the 'distinct possibility' standard." *Mann*, 630 F.3d at 344. Under this standard, "protected activity occurs when an employee's opposition to fraud takes place in a context where 'litigation is a distinct possibility, when the conduct reasonably could lead to a viable FCA action, or when . . . litigation is a reasonable possibility.'" *Id.* (quoting *Eberhardt*, 167 F.3d at 869). While the distinct possibility standard is objective, it is applied from the perspective of the facts known by the employee at the time he engaged in the allegedly protected activity. *Mann*, 630 F.3d at 344–45. Thus, inquiry into the protected-activity element of an FCA retaliation claim can "be distilled to the requirement that an employee-plaintiff make two showings: (1) the employee took action in furtherance of an FCA claim that (2) raised a distinct possibility of suit, from the perspective of the employee at the time." *Glynn v. Impact Sci. & Tech., Inc.*, 807 F. Supp. 2d 391, 404 (D. Md. 2011).

In order to determine whether Dr. Huang has made these two showings, it is useful to review the relevant chronology of facts. Dr. Huang contends that he engaged in investigation in furtherance of an FCA claim when he internally reported his suspicions that Dr. Li was manipulating levels of effort on the ANKK1 grant. In August 2009, Dr. Huang met with Dr.

Lou.  At their meeting, Dr. Lou conveyed to Dr. Huang his own suspicions that Dr. Li was using funds from his grant to pay for unrelated costs.  This conversation, together with the several instructions he received directing him to return the laptop he had purchased, prompted Dr. Huang to review UVa policies regarding grant management.  As a result, Dr. Huang learned that, because he was the principal investigator for the ANKK1 grant, he should have been receiving monthly financial reports on the expenditure of the grant's funds.

Dr. Huang inquired about the availability of these reports, first by contacting Ms. Franco on August 30, 2009, and then by emailing Mr. Benham on September 1 and 2, 2009.  At this point, though, Dr. Huang had no reasonable basis for suspecting fraud or misappropriation of grant funds.  After failing to obtain a definitive response from Mr. Benham, though, Dr. Huang evidently began developing suspicions as evidenced by his email to Dr. Johnson on September 4, 2009.  In the email, Dr. Huang not only expressed his desire to review the reports, but also his concern that someone else might have been controlling the ANKK1 grant funds.  Specifically, Dr. Huang wrote, in pertinent part:

> I suspect that someone, not me, is controlling over my grant account, which is against the university regulation.  Could you please help me find out as soon as possible what is going on with my grant account?  Also, could you please advise me if I need report this issue as well to the Office of Sponsored Programs and/or the University Audit Department in case there is something fraudulent occurred in my grant account?

Pl.'s Mem. Opp'n Mot. Summ. J., Ex. 33 (quoted verbatim).  To be sure, Dr. Huang's email to Dr. Johnson on September 4, 2009, did not specifically mention that he was investigating fraud against the government, or that he was pursuing a qui tam action per se.  However, there can be no doubt that, as of this date, at least Dr. Johnson had been put on notice that Dr. Huang suspected something fraudulent might have been occurring with respect to the ANKK1 grant.

34

Dr. Huang's receipt of the monthly reports from Dr. Li in late September 2009 confirmed his suspicions that somebody else was controlling the allocation of grant funds for salary purposes and that somebody else had altered the levels of effort that he had assigned for the ANKK1 grant in his original proposal.   That the discovery of such misallocation was a significant development cannot be seriously debated; after all, the FSGC later described it as a "serious breach of University policy," Pl.'s Mem. Opp'n Mot. Summ. J., Ex. 21, and the FSPRP termed the level of effort changes that Dr. Li had engineered prior to Dr. Huang's non-renewal as "illegitimate and perhaps illegal cost allocations . . . ," *id.* at 6.   Armed with the knowledge that somebody else (i.e., Dr. Li) was manipulating levels of effort on the grant despite the fact that only he, as principal investigator, was permitted to do so, Dr. Huang went to Dr. Johnson.   On October 12, 2009, Dr. Huang verbally reported his concerns and suspicions directly to Dr. Johnson.   The following noteworthy exchange took place during Dr. Johnson's deposition testimony:

> Q: Dr. Huang had accused Dr. Li on October 12th of fraud.  Isn't that correct?
> A: That's a technical word.  Could you put it in more lay language?
> Q: Dr. Huang had accused Dr. Li of being dishonest with respect to his grant by changing levels of effort that were false and being submitted to the government as false.  Isn't that correct?  And he did that on October 12th, to you, in your office?
> A: Yes, he told -- he expressed his concern.  And pursuant to that, I did speak with Professor Li.

Johnson Dep., 53:16-22; s*ee also* Pl.'s Mem. Opp'n Mot. Summ. J., Ex. 4.

In *Yesudian*, the United States Court of Appeals for the D.C. Circuit discussed the fact that such an internal complaint can qualify as protected activity.  *See* 153 F.3d at 743 ("[T]here also is no requirement that a plaintiff tell, or threaten, his employer that he will report his allegations to the government—or to anyone outside of the employing institution.  As the statute does not require the employee to make an outside complaint in order to render his conduct protected, he cannot be required to advise of or threaten such a complaint.").   Indeed, "a

35

requirement that an employee announce he has gone outside the institution would undercut the statutory purpose of encouraging employees to expose fraud." *Id.* (citation omitted).  In order for such an internal report to constitute protected activity under the FCA, it must allege that there has been a fraud on the government.  *See Zahodnick*, 135 F.3d at 914 ("Simply reporting . . . concern of a mischarging to the government to [one's] supervisor . . . does not suffice to establish that [one] was acting in furtherance of a *qui tam* action.") (citation and internal quotation marks omitted).  That being said, such an allegation of fraud need not be explicit.  *See Eberhardt*, 167 F.3d at 868 (stating that an employee can provide a sufficient degree of notice "by any action which a factfinder reasonably could conclude would put the employer on notice that litigation is a reasonable possibility.").  So, the question remains: in disclosing his suspicions of fraud directly to Dr. Johnson, did Dr. Huang engage in activity that, from his perspective at the time, he reasonably believed carried the distinct possibility of leading to an FCA suit?

In urging that the question be answered in the negative, Defendants argue that, as a matter of law, Dr. Huang's activity cannot be considered protected under the FCA.  According to Defendants, Dr. Huang's "obsession with levels of effort on the ANKK1 Grant dealt simply with an administrative detail on a NIH grant which was routine, meant to be adjusted over time consistent with established grant administration procedures, was in fact adjusted in response to his request consistent with University policy, and did not—despite his tiresome recapitulated characterization to the contrary—constitute fraud."  Defs.' Mem. Supp. Mot. Summ. J.  Further, in support of their contention that Dr. Huang could not have been alleging a fraud on the government when he went to Dr. Johnson on October 12, 2009, Defendants point out that, when given the opportunity, the NIH declined to investigate the matter.  In other words, Defendants maintain, Dr. Huang could not have reasonably believed that there was a possibility that

36

litigation would ensue when the very entity that he claims to have thought was being defrauded—namely, the NIH—itself declined even to look into the matter.

However, Defendants' argument in this regard is unpersuasive. The relevant inquiry is whether, when viewed in an objective light, there was a distinct possibility of fraud at the time the evidence presented itself to Dr. Huang. Therefore, the fact that the NIH declined to investigate years after the fact, while perhaps buttressing Defendants' assertion that no fraud actually took place, does not correspondingly mean that Dr. Huang's activity—in the form of raising an alarm—was unprotected. Moreover, whether Dr. Li's conduct actually constituted fraud is essentially irrelevant; the question is not whether, looking backward, Defendants' conduct was actionable under the FCA, but rather whether, at the time, Dr. Huang believed his disclosure could reasonably lead to an FCA action. Ultimately, I find that, on the basis of the facts recounted above, reasonable jurors could disagree on the answer to this question. It cannot be said, as a matter of law, that Dr. Huang did not engage in protected activity. I find that the "distinct possibility" test here is best answered by a jury.

## 2. Defendants' Knowledge

The second component of a prima facie retaliation case under § 3730(h) is that the employer knew of the acts taken by the employee that constituted protected activity. *See Zahodnick*, 135 F.3d at 914. Mere knowledge that Dr. Huang engaged in a particular activity, though, is not sufficient to meet this element. Rather, Defendants must have also known that Dr. Huang's activity amounted to protected activity. *See, e.g.*, *Glynn*, 807 F. Supp. 2d at 412–13 ("The employer must have knowledge of more than the employee's acts; the employer must have known that these acts raised a distinct possibility of a FCA suit.") (citations omitted). Once

again, I find that reasonable jurors could disagree about whether Defendants knew Dr. Huang had engaged in protected activity, and that the question cannot be answered as a matter of law.

On the one hand, when Dr. Huang approached him, Dr. Johnson may have believed that Dr. Huang was raising a grievance or matter of administration and nothing more, not that Dr. Huang was actively engaged in the investigation of fraud on the government.  On the other hand, Dr. Huang claims to have specifically alleged fraud by Dr. Li in his communications with Dr. Johnson, and the excerpt of Dr. Johnson's deposition testimony quoted above essentially confirms as much.  Therefore, unlike the employer in *Glynn*, which had no knowledge that its employee suspected fraud or illegality, 807 F. Supp. 2d at 413, Dr. Johnson had at least some knowledge in this regard.  Moreover, as the *Glynn* court pointed out, when, as here, the employee is not specifically charged with investigatory duties (like, say, an auditor is), "there are no 'magic words,' and the employee need only show that the employer was aware of the employee's investigation."  *Id.* at 413 n.15 (citation omitted).  Because the relevant facts do not indisputably reveal a lack of awareness on Defendants' part regarding Dr. Huang's activity, or that his conduct could not have led to the distinct possibility of an FCA action as far as Defendants were concerned, the question of whether this element has been shown must also be submitted to a jury.

   3. Causal Connection between Protected Activity and Adverse Employment Action

As previously discussed, the last element of an FCA retaliation action is that the plaintiff-employee suffered an adverse employment action on the basis of the protected activity in which he engaged.  In other words, the plaintiff must establish a causal connection between the investigation of fraud against the government and the alleged retaliatory action.  The court in *Glynn* distilled this causation element as follows:

> The FCA's legislative history requires an employee to show that "the retaliation was motivated, at least in part, by the employee's engaging in protected activity. Once [this] element[] [has] been satisfied, the burden of proof shifts to the employer to prove affirmatively that the same decision would have been made even if the employee had not engaged in protected activity."

807 F. Supp. 2d at 415 (quoting S. Rep. No. 99-345, at 35, *reprinted in* 1986 U.S.C.C.A.N. 5266, 5300).

At the outset, I observe that the facts uncovered through discovery can support an inference that, to the extent Defendants' issuance of the non-renewal letter constitutes retaliation, such retaliation was, at least in part, caused by Dr. Huang's engagement in that which he contends was protected activity.   A brief restatement of the pertinent facts supports this inference.  On September 2, 2009, Dr. Huang renewed his request for the monthly status reports by emailing Mr. Benham about them for the second time.  The next day, September 3, 2009, Mr. Benham forwarded Dr. Huang's request to Dr. Li.  Hours later, Dr. Li told Mr. Benham to hold back on issuing the reports.  Later that same day, Dr. Li emailed Mr. Benham, and copied Dr. Johnson, stating in part that "[i]t is time to do proper paper work and let him go.  Too much headache for me."  Dr. Huang contends that a jury could reasonably interpret this series of events as evidence of Dr. Li's intent to retaliate against Dr. Huang for raising the monthly reports issue (which Dr. Li knew would inevitably lead to Dr. Huang discovering the level-of-effort alterations).  I agree.

However, the more difficult question here is whether Defendants have affirmatively shown that Dr. Huang would have received a non-renewal notice notwithstanding his uncovering of the level-of-effort issue.  There can be no doubt that Dr. Li had issues with Dr. Huang before Dr. Huang ever requested or received the monthly status reports for the grant.  For example, Dr. Li reprimanded Dr. Huang for not fulfilling some of the conditions of his promotion, writing in a letter dated May 30, 2008 that Dr. Huang's performance had been "far below what I expect" and

citing Dr. Huang's "low and unacceptable productivity."  Li Decl., Ex. B.  Then, in the fall of

2008, Dr. Huang submitted the NIH proposal with Dr. Li listed in the budgeted personnel as a

co-investigator despite having failed to disclose to Dr. Li that he was doing so.  Dr. Li described

this conduct as "unacceptable" and "unethical."  Li Decl. ¶ 13.  Thereafter, in January 2009, Dr.

Li emailed Dr. Johnson, writing:

> After your evaluation is over, we have to find way to take care of this issue.  He
> has been this way for a couple of years and I am so tired and feel hopeless for this
> situation.  He never show too much appreciation for whatever he gets.  He always
> think he is right and he deserves more and better.  I have been "back-up" so many
> times but I never see an end.  This is why I feel that, this time, I must keep my
> words and do not change my decision.  I know if I let him to win this one through
> you, he will have another one (which will destroy both of us).  I cannot be so nice
> anymore to him.  To be honest, I never see second person like him among more
> than 50 students, postdoctoral fellows and technicians who have been worked for
> me.  I wish I did not change his visa and let him go at that time.  But I never
> expect he becomes so 'selfish' and 'untrusted.'

Johnson Aff., Ex. B (quoted verbatim).  Finally, and perhaps most significantly from a temporal

perspective, approximately three months before Dr. Huang received his non-renewal notice, the

laptop episode took place.  Dr. Huang's initial intransigence in the face of several instructions to

return the laptop clearly exacerbated frustrations with his conduct.  Additionally, while it is true

that, up until he received his non-renewal notice, Dr. Huang had received what one would

generally regard as positive performance reviews throughout his employment,[17] Defendants

point out the fact that, of all the faculty members Dr. Li evaluated between 2006 and 2009, Dr.

Huang received the second lowest evaluations on average.  Moreover, Dr. Huang's most recent

performance evaluation prior to his non-renewal took place approximately five months

beforehand in June 2009.  Thus, Dr. Huang's last performance evaluation occurred before the

laptop debacle, which Defendants imply was the straw that broke the camel's back.  While Dr.

---

[17] Dr. Huang received marks that were, at worst, "good," but primarily "commendable," and once even "excellent."
Pl.'s Mem. Opp'n Mot. Summ J., Ex. 16.

Huang may very well dispute the significance or even accuracy of some of these complaints, "it is the perception of the decision maker which is relevant, not the self-assessment of the plaintiff." *Hawkins v. PepsiCo, Inc.*, 203 F.3d 274, 280 (4th Cir. 2000).

Based on the foregoing points, Defendants contend that the decision to not renew Dr. Huang's term of employment was made before he received the monthly status reports and before he communicated his suspicions to Dr. Johnson.   Supporting Defendants' contention is the FSGC's conclusion that "[i]t appears unlikely that [Dr. Huang]'s appointment would have been renewed in any case."  Pl.'s Mem. Opp'n Mot. Summ. J., Ex. 21.  However, there are compelling counterarguments that cut against the notion that Dr. Huang's non-renewal was a fait accompli and unconnected to his complaints about fraud.

For example, as Dr. Huang points out, there was no discussion of his non-renewal in Dr. Johnson's draft letter of October 30, 2009, which Dr. Johnson composed just a few weeks before Dr. Huang received his non-renewal letter.  Additional, more persuasive evidence is found in Dr. Johnson's deposition testimony.  Dr. Johnson testified that the decision not to renew Dr. Huang was made "[j]ust prior to November 20."  Johnson Dep., 44:15.  Accepting Dr. Johnson's testimony, the fact that Dr. Huang's non-renewal was based at least in part if not primarily on the events that took place in September and October 2009 cannot be definitively ruled out.  Finally, though they are by no means dispositive of Defendants' motives with respect to Dr. Huang's non-renewal, the FSGC and FSPRP reports lend credence to Dr. Huang's assertion that his protected activity directly caused his non-renewal.  The former described Dr. Huang's charge against Dr. Li as "probably the precipitating event for the November 20, 2009 non-renewal letter," Pl.'s Mem. Opp'n Mot. Summ. J., Ex. 21, and the latter stated "a reasonable person in Dr. Huang's position could conclude that his raising of the issue of improper charges contributed

41

both to his non-renewal and the imposition of the conditions he subsequently violated," Pl.'s Mem. Opp'n Mot. Summ. J., Ex. 23, at 8.[18]

In the end, I find that there is ample evidence from which a reasonable jury could infer that Defendants' decision to issue Dr. Huang the non-renewal letter was motivated, at least in part, by Dr. Huang's protected activity—namely, presenting his suspicions about the fraudulent allocation of levels of effort on the ANKK1 grant.  However, I cannot say that Defendants have affirmatively shown that they would have made the same decision irrespective of Dr. Huang's protected activity.  While a record of friction between Dr. Huang and Defendants certainly exists, the temporal proximity of Dr. Huang's allegations regarding misappropriation of grant funds and his non-renewal could lead reasonable jurors to conclude that Defendants' stated rationales for their decision to issue the non-renewal letter were merely a pretext for otherwise retaliatory action.  "Courts should be especially cautious before granting summary judgment when pretext and retaliatory animus are at issue."  *Harrington v. Aggregate Indus. Ne. Region, Inc.*, 668 F.3d 25, 33 (1st Cir. 2012).  Here, the relevant evidence uncovered during discovery does not allow me to conclude, as a matter of law, that Defendants would have necessarily issued Dr. Huang the non-renewal letter in the event he had not reported his suspicions of fraud against the government.  Accordingly, Defendants are not entitled to summary judgment on Dr. Huang's FCA retaliation claims.

---

[18] It should be noted that the FSPRP report was prepared at the Provost's request in response to Dr. Hostler's recommendation that Dr. Huang be terminated.  In other words, the FSPRP's mission was not to investigate fully the circumstances surrounding Dr. Huang's non-renewal or to offer an opinion on whether that outcome was an act of retaliation.  However, that does not mean that I am bound to ignore entirely its blunt conclusion regarding what a reasonable person in Dr. Huang's position would have assumed about the rationale for his non-renewal.

4. Availability of Prospective Injunctive Relief

Defendants assert that, even if they are not entitled to summary judgment on Dr. Huang's FCA claims, no prospective injunctive relief is realistically available to him in the event he were to prevail at trial.[19]  The injunctive relief that Dr. Huang seeks includes, but is not limited to, reinstatement to his position as a research assistant professor in the Department.  Defendants point out that on June 10 and 16, 2010, Dr. Hostler gave Dr. Huang opportunities to return to work on the ANKK1 grant, but he declined both offers despite their "generous" conditions, as described by Mr. Rood, the FSGC chairman.  Huang Dep., Ex. 15.  Additionally, on November 17, 2010, Dr. Johnson offered to reinstate Dr. Huang, but again Dr. Huang refused.  Thus, Defendants argue, Dr. Huang has repeatedly rejected the very form of relief he now seeks.

While that may be true, there is a difference between reinstatement being a hard pill for Defendants to swallow and it being impossible to effectuate.  Thus far, Defendants have not asserted that it would be infeasible to reinstate Dr. Huang or that they lack the authority to do so.  Separately, I observe that simply because offers were made to Dr. Huang that purported to allow him to finish his research does not mean that those offers were necessarily *reasonable* to Dr. Huang.  Indeed, Dr. Huang points out that, if he had accepted any of the aforementioned offers, which were not accompanied by start-up funding, he would have been forced to utilize ANKK1 funds to establish a new laboratory before returning to his research (because he would not have been able to utilize Dr. Li's laboratory).  And that, according to Dr. Huang, would itself have been a misuse of the NIH grant money, which was awarded for research only, not laboratory set-up.  Further, as Dr. Huang set out in his letter to the Secretary of the Board of Visitors, he did not think it prudent to accept the offers of Dr. Hostler and Dr. Johnson while his grievance appeal

---

[19] I reiterate that, at the motion to dismiss stage, I dismissed Dr. Huang's official-capacity FCA claims against Defendants for damages.  Thus, it is only prospective injunctive relief, to the extent it is available, that Dr. Huang can obtain from Defendants in their official capacities.

was still pending, for doing so might have been considered acquiescence to Defendants' fraud and retaliation (and thus a waiver of any future cause of action).  As such, Dr. Huang contends that his refusal of the offers was reasonable and justified.  Whether it was or not is a question for a jury; consequently, it need not be resolved at this stage.  *See Fiedler v. Indianhead Truck Line, Inc.*, 670 F.2d 806, 808 (8th Cir. 1982) ("Generally, it is the duty of the trier of fact to weigh the evidence to determine whether a reasonable person would refuse the offer of reinstatement.").

With respect to injunctive relief, Dr. Huang argues that, to the extent reinstatement is impossible or impracticable, the alternative equitable remedy of front pay is still available.  In *Duke v. Uniroyal Inc.*, 928 F.2d 1413, 1423 (4th Cir. 1991), the Fourth Circuit observed that, "notwithstanding the desirability of reinstatement, intervening historical circumstances can make it impossible or inappropriate," and in such scenarios, "front pay is an available remedy to complete the panoply of remedies available to avoid the potential of future loss."  (citations omitted).  Thus, "front pay may serve as a substitute or a complement" to reinstatement.  *Id.* at 1424.  That being said, it should be noted that *Duke* was not an FCA case.

The FCA's retaliation provision states that an employee "shall be entitled to all relief necessary" to be made whole.  31 U.S.C. § 3730(h)(1).  Clearly, such broad, sweeping language would imply that front pay is an available remedy.  However, in the subsection of the retaliation provision labeled "Relief," front pay is not one of the enumerated remedies.  *Id.* § 3730(h)(2).  In *Wilkins v. St. Louis Housing Authority*, 198 F. Supp. 2d 1080, 1091 (E.D. Mo. 2001), *aff'd*, 314 F.3d 927 (8th Cir. 2002), the district court acknowledged the fact that "the FCA does not specifically include front pay as a remedy available to the court to effect full compensation." (citation omitted).  Nevertheless, the court concluded that "Congress intended that front pay be awarded in the appropriate case to effect the express Congressional intention that a claimant

under § 3730(h) be made whole." *Id.*  The *Wilkins* court's resolution of the inherent tension in § 3730(h) regarding forms of relief, while sound, is of course not binding on me.  However, for purposes of resolving Defendants' motion for summary judgment, the availability of front pay to Dr. Huang should he prevail at trial need not be decided at this juncture.  Rather, motions filed in advance of trial represent the appropriate means and moment to litigate this issue.

## IV. CONCLUSION

For the reasons stated herein, Defendants' motion for summary judgment, as it concerns Dr. Huang's § 1983 claims, shall be granted, but as it concerns Dr. Huang's FCA claims, Defendant's motion shall be denied.   An appropriate order accompanies this memorandum opinion.

The Clerk of the Court is hereby directed to send a certified copy of this memorandum opinion and the accompanying order to all counsel of record.

Entered this   6th   day of September, 2012.

NORMAN K. MOON
UNITED STATES DISTRICT JUDGE