# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### CHARLOTTESVILLE DIVISION

|  |  |
|---|---|
| WEIHUA HUANG,<br><br>                                    *Plaintiff,*<br><br>               v.<br><br>THE RECTOR AND VISITORS OF THE UNIVERSITY<br>OF VIRGINIA, ET AL.,<br>                                    *Defendants.* | CASE NO. 3:11-cv-00050<br><br><br>MEMORANDUM OPINION<br><br><br>JUDGE NORMAN K. MOON |

After a four-day trial in this False Claims Act ("FCA") retaliation case, a jury found in favor of Plaintiff Weihua Huang ("Plaintiff") against Defendants Ming D. Li ("Dr. Li") and Bankole A. Johnson ("Dr. Johnson") (collectively, "Defendants"), and awarded Plaintiff $159,915 in lost wages and $500,000 in compensatory damages.   Pending before this Court are three motions filed after the trial: (1) Defendants' motion pursuant to Federal Rule of Civil Procedure 50(b) and Rule 59 for judgment as a matter of law or for a new trial; (2) Defendants' motion for a new trial *nisi remittitur*; and (3) Plaintiff's motion for front pay as a form of equitable relief in the absence of reinstatement.[1]  For the following reasons, I will deny Defendants' motion for judgment as a matter of law, grant Defendants' motion for a new trial *nisi remittitur*, and deny Plaintiff's motion for front pay.

## I. BACKGROUND[2]

This action arises out of Plaintiff's employment by the Rector and Visitors of the University of Virginia ("UVa") as a research assistant professor in the Department of Psychiatry

---

[1] Also pending is Plaintiff's motion for attorneys' fees, which I  referred to Magistrate Judge B. Waugh Crigler, who stayed proceedings related to attorneys' fees and costs pending resolution of the other post-trial motions.
[2] A more detailed summary of the facts in this case can be found in this Court's opinion in *Huang v. Rector and Visitors of the Univ. of Va.*, -- F. Supp. 2d --, No. 3:11-cv-00050, 2012 WL 4458177 (W.D. Va. 2012).

and Neurobehavioral Sciences (the "Department") within UVa's School of Medicine. Plaintiff performed research in a lab run by Dr. Li, who had been Plaintiff's supervisor and mentor at multiple universities beginning in 1999. Dr. Johnson was and remains the chairman of the Department. In 2008, Plaintiff applied for a grant from the National Institutes of Health ("NIH") to fund a proposed research project called "Functional Characterization of ANKK1 and its Genetic Variants" (the "ANKK1 Grant"). Dr. Huang secured the approval of Dr. Li and Dr. Johnson, and the NIH approved the project for a period from June 15, 2009, through February 28, 2011. Plaintiff was to serve as the sole "principal investigator" or "PI" on the ANKK1 Grant, but he was to perform the research in Dr. Li's lab.

Shortly after Plaintiff began working on the ANKK1 Grant, he became concerned that he had not been receiving monthly status reports for the grant from the Department and that someone else had taken control over the grant. In August and September of 2009, Plaintiff contacted Department staff and ultimately Dr. Johnson to express his concerns. When he finally received the status reports, he found that Dr. Li had changed the "levels of effort" on the grant without his authorization. The "levels of effort" reflected how much time individuals in Dr. Li's lab spent working on the grant, and money from the grant was allocated to salaries and expenses based on the levels recorded. As the PI, Plaintiff was charged with responsibility to allocate, alter, and approve any level of effort charged to the project account. According to Plaintiff, Dr. Li's changes to the "levels of effort" did not accurately reflect the work that was actually being conducted on the ANKK1 Grant, and the changes would have had the effect of drawing money from the ANKK1 project to pay unrelated salaries and expenses. Believing that Dr. Li's actions represented a misappropriation of the ANKK1 Grant funds, Plaintiff reported the unauthorized modifications to Dr. Johnson. Although he denied that Dr. Li's actions were inappropriate or

unlawful, Dr. Johnson assured Plaintiff that the changes would be readjusted and any money that had been withdrawn would be refunded.

Shortly thereafter, on or about November 20, 2009, Plaintiff received a notice of non-renewal from Dr. Johnson, informing him that UVa would not be renewing his employment contract, which was set to expire one year later, in November 2010. Plaintiff believed that the non-renewal of his contract constituted retaliation for raising his concerns about the incorrect assignment of "levels of effort" on the ANKK1 Grant. Consequently, he filed suit in this Court in August 2011, bringing a variety of claims against Defendants and UVa. In ruling on Defendants' motions to dismiss and for summary judgment, I dismissed all of Plaintiff's claims except one: a claim against Defendants for retaliation in violation of the FCA. That claim proceeded to trial, and the jury found in favor of Plaintiff against both Defendants.

## II. Defendants' Motion for Judgment as a Matter of Law

Federal Rule of Civil Procedure 50(a)(1) authorizes a court to grant a party judgment as a matter of law where there is "no legally sufficient evidentiary basis for a reasonable jury to find" for the opposing party on an issue. "A Rule 50(b) motion should be granted if a district court determines, without weighing the evidence or considering the credibility of the witnesses, that substantial evidence does not support the jury's findings." *Konkel v. Bob Evans Farms Inc.*, 165 F.3d 275, 279 (4th Cir. 1999). In considering a Rule 50(b) motion, a court must examine the evidence in the light most favorable to the non-moving party. *Brown v. CSX Transp., Inc.*, 18 F.3d 245, 248 (4th Cir. 1994). "A court should only grant such a motion if it determines that 'the only conclusion a reasonable trier of fact could draw from the evidence is in favor of the moving party.'" *Bonner v. Dawson*, 404 F.3d 290, 295 (4th Cir. 2005) (quoting *Figg v. Schroeder*, 312 F.3d 625, 635 (4th Cir. 2002)).

"Unlike a motion made under Rule 50, a motion made under Rule 59(a) permits the Court to weigh the evidence and to consider the credibility of witnesses." *Bennett v. R & L Carriers Shared Servs., LLC*, 744 F. Supp. 2d 494, 509 (E.D. Va. 2010) (citing *Cline v. Wal-Mart Stores, Inc.*, 144 F.3d 294, 301 (4th Cir. 1998)). A court should grant a new trial if: "[1] the verdict is against the clear weight of the evidence, or [2] is based upon evidence which is false, or [3] will result in a miscarriage of justice, even though there may be substantial evidence which would prevent the direction of a verdict." *Atlas Food Sys. and Servs., Inc. v. Crane Nat. Vendors, Inc.*, 99 F.3d 587, 594 (1996) (quoting *Aetna Casualty & Sur. Co. v. Yeatts*, 122 F.2d 350, 352–53 (4th Cir. 1941)). The decision whether to grant a new trial is reviewed for abuse of discretion. *Id.*

### A. Individual Liability Under the FCA

Defendants first argue that they are entitled to judgment as a matter of law because the FCA does not provide for individual liability. In support of this argument, Defendants rely on *Aryai v. Forfeiture Support Associates, LLC*, No. 1:10-cv-08952, 2012 U.S. Dist. LEXIS 125227 (S.D.N.Y. Aug. 27, 2012), which was decided after the parties in this case concluded their briefing on Defendants' summary judgment motion. The plaintiff in *Aryai* brought a claim against the United States Marshals Service and one of its employees for retaliation in violation of the whistleblower provision of the FCA, 31 U.S.C. § 3730(h), and the court held that "section 3730(h) does not apply to individuals." *Id.* at *12–13. After concluding that the claim against the Marshals Service was barred by sovereign immunity, *id.* at *13–19, the court dismissed the claim for damages against the individual defendant in his official capacity for the same reasons. *Id.* at *19. The court then considered whether the FCA permitted a claim against the individual defendant in his individual capacity, ultimately concluding that it did not. *Id.* at *27.

Prior to 2009, it was clear that § 3730(h) did not apply to individual supervisors.  *Id.* at *19 (citing *United States ex rel. Golden v. Ark. Game & Fish Comm'n*, 333 F.3d 867, 870–71 (8th Cir. 2003)); *see also Huang*, 2012 WL 4458177, at *18 n.16 ("Prior to the 2009 amendment, plaintiffs could only file FCA retaliation claims against their employers.").  In 2009, however, Congress amended the FCA statute, removing the reference to retaliation "by [an] employer," and arguably expanding the universe of possible defendants to include individual supervisors.  *See Aryai*, 2012 U.S. Dist. LEXIS 125227, at *20.  After conceding that "there is some merit" to the argument that the defendants in *Aryai* were asking the court "to read words into a statute that are simply no longer there" by retaining the old prohibition against individual liability, the court nevertheless concluded that common sense, precedent, and legislative history "rebut the presumption that Congress intended to expand liability by removing the word 'employer' from section 3730(h)."  *Id.* at *22.

Although the *Aryai* court stated that it was "aware of no other court's having conclusively decided this issue" of individual liability after the 2009 amendments, *id.* at *20, it recognized that the court in *Laborde v. Rivera-Dueño*, 719 F. Supp. 2d 198, 205 (D.P.R. 2010), did discuss the issue.  *See Aryai*, 2012 U.S. Dist. LEXIS 125227, at *20.  In *Laborde*, the plaintiff brought a FCA retaliation claim against the acting Secretary of the Puerto Rico Department of Health in his individual capacity.  719 F. Supp. 2d at 200, 203.  In considering whether the FCA provided for individual liability after the 2009 amendments, the *Laborde* court stated that "[i]n the absence of specific First Circuit guidance holding that individual liability does not exist in FCA retaliation claims, and in light of the fact that the persuasive authority on the issue relies upon an outdated version of the statute," the court would not grant the defendant's motion to dismiss.  *Id.* at 205. The *Aryai* court found the *Laborde* decision was not persuasive because it "did not advance any

affirmative reason to interpret the amended statute as providing for individual liability," *see Aryai*, 2012 U.S. Dist. LEXIS 125227, at *20 n.5, and because the it was later vacated on other grounds in *Laborde v. Rivera-Dueño*, No. 09-1368, 2011 WL 814965 (D.P.R. Mar. 4, 2011). *See id.*

Plaintiff asserts that Defendants have waived the argument that the FCA does not provide for individual liability. Defendants' argument is "in the nature of a Rule 12(b)(6) motion," Plaintiff argues, therefore Defendants needed to raise it "no later than at trial according to Rule 12(h)(2)(C)." Rule 50(a)(2) provides that a "motion for judgment as a matter of law may be made at any time before the case is submitted to the jury. The motion must specify the judgment sought and the law and facts that entitle the movant to judgment." "Since the post-submission motion is nothing more than a renewal of the earlier motion made at the close of the presentation of the evidence, the case law makes it quite clear that the movant cannot assert a ground that was not included in the earlier motion." 9B Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure* § 2537 (3d ed. 2008) (citing *Unitherm Food Sys., Inc. v. Swift-Eckrich, Inc.*, 546 U.S. 394, 400–01 (2006)). Defendants did not raise the issue of whether the FCA permits individual liability either before or during the trial;[3] thus, Plaintiff contends, they have waived the argument.

---

[3] In my opinion granting in part and denying in part Defendants' motion for summary judgment, I noted that Defendants had not raised the issue of individual liability, and I adopted an approach similar to that taken by the court in *Laborde*. I found that:

> In the absence of specific guidance from the United States Court of Appeals for the Fourth Circuit dictating that there can be no individual liability in FCA retaliation claims after the 2009 amendment, and because Defendants do not assert in their motion that Dr. Huang's FCA claims against them are legally impermissible, I will not dismiss those claims out of hand. Instead, I proceed to the ordinary summary judgment analysis.

*Huang*, 2012 WL 4458177, at *18 n.16.

Defendants make two arguments in response. First, they argue that if the FCA does not provide for individual liability, then this Court lacks subject matter jurisdiction to hear this case, and objections to subject matter jurisdiction can be raised at any time. *See, e.g.*, *Henderson v. Shinseki*, 131 S. Ct. 1197, 1202 (2011). But Defendants' argument about the availability of individual liability does not raise a jurisdictional question; rather it goes to whether Plaintiff can state a claim and to the merits of his case. "A district court has subject-matter jurisdiction under [28 U.S.C.] § 1331 when 'the right of the petitioners to recover under their complaint will be sustained if the Constitution and laws of the United States are given one construction and will be defeated if they are given another." *Laber v. Harvey*, 438 F.3d 404, 425 (4th Cir. 2006) (quoting *Bell v. Hood*, 327 U.S. 678, 681 (1946)). That is precisely the situation in this case: Defendants are asking this Court to interpret a federal statute one way, and Plaintiff believes it should be interpreted a different way. Regardless of how this Court might answer that question, it certainly has jurisdiction to decide the issue. I therefore conclude that Defendants' argument is not a jurisdictional one that cannot be waived.

Second, Defendants argue that *Aryai* represents an "intervening change in the law recognizing an issue that was not previously available," *Holland v. Big River Minerals Corp.*, 181 F.3d 597, 605 (4th Cir. 1999), and therefore they have not waived their argument regarding individual liability. Although they emphasize that unlike *Holland*, this case does not involve a potentially dispositive argument being made for the first time on appeal, but rather at the district court level, Defendants nevertheless make their case under *Holland*'s analytical framework. The court in *Holland* stated that:

> The intervening law exception to the general rule that the failure to raise an issue
> timely in the district court waives review of that issue on appeal applies when
> there was strong precedent prior to the change such that the failure to raise the

issue was not unreasonable and the opposing party was not prejudiced by the failure to raise the issue sooner.

*Id.* at 605–06 (citations omitted). Although Defendants assert that there was "a good amount of law strongly suggesting, without deciding, that individual liability was a possible remedy under § 3730(h) after the 2009 amendment," none of the cases they cite support that claim. In fact, their argument on the first prong of the *Holland* analysis is seriously undermined by the *Aryai* court's conclusion that only one other case, *Laborde*, "even discusses the issue." *Aryai*, 2012 U.S. Dist. LEXIS 125227, at *20 n.5. If only one other case even discussed the issue, it is extremely difficult to see how there was "strong precedent prior to the change such that the failure to raise the issue was not unreasonable." If anything, the "strong precedent" that predated *Aryai* appeared to support Defendants' position, not Plaintiff's. Given that, as Defendants point out, "for over 146 years the FCA clearly provided for no individual liability," there does not appear to be any good reason why Defendants could not have made at an earlier stage in this case the same arguments made by the defendants in *Aryai*. In any case, I fail to see how a lone district court case outside of this circuit could constitute an intervening change in the law. Accordingly, I conclude that there has not been an intervening change in the law that would excuse Defendants' failure to raise the issue of individual liability before or during trial, and they have therefore waived that argument.[4] Because I find that Defendants have waived the argument that the FCA does not provide for individual liability, I need not decide that issue.

### B. Accuracy of the Jury Instructions

Defendants renew the argument they made at trial that the claim Plaintiff argued to the jury was different from that alleged in the Amended Complaint and was not supported by the

---

[4] The fact that this Court specifically noted that Defendants had not made any argument about individual liability in their motion for summary judgment further indicates that the argument was one that was available for Defendants to make at that time or at trial.

jury instructions filed before trial.  Defendants suggest that they faced some type of unfair surprise when Plaintiff submitted proposed jury instructions during trial that were different than those submitted before trial.  Since the Court decides what instructions to give, Defendants' position must boil down to an argument either that Jury Instruction #12 incorrectly stated the law or that the claim Plaintiff made did not support giving the instruction at all.  Specifically, Defendants take issue with the following portion of Jury Instruction #12: "Violations of the False Claims Act include . . . knowingly making, using, or causing to be used, a false record or statement material to a false or fraudulent claim."  Defendants argue this instruction:

> effectively transformed the case Plaintiff had pled and supported with his timely filing of proposed instructions, which was a case of misappropriation of funds, attempts to defraud the federal government, and reasonable basis for an actual false claim, to one that required no more than the creation of a false record that could potentially result in a false or fraudulent claim.

As Plaintiff points out, however, Count I of the Amended Complaint explicitly alleged FCA retaliation under 31 U.S.C. § 3730(h).  Section 3730(h) provides relief for retaliation "because of lawful acts done by the employee . . . in furtherance of an action under this section or other efforts to stop 1 or more violations of this subchapter."  One type of violation of the FCA occurs when a person "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim."  31 U.S.C. § 3729(a)(1)(B).  Since Jury Instruction #12 precisely tracked the language of the statute, I find that it accurately stated the law.  The core of Plaintiff's Amended Complaint alleged that he suffered retaliation for actions he took in furtherance of an effort to stop the type of FCA violation described in Jury Instruction #12.  Consequently, and as I will discuss in more detail in the next section, I find that the evidence presented at trial supported giving the instruction.

<u>C.  Sufficiency of the Evidence</u>

Defendants also contend that there was insufficient evidence for a jury to find in favor of Plaintiff, and they assert that the jury's verdict was inconsistent with this Court's instructions. Generally, Defendants argue: (i) that it was unreasonable for the jury to find that Plaintiff suffered retaliation because the evidence showed that he would have been fired anyway; and (ii) neither Dr. Li nor Dr. Johnson had any actual or constructive knowledge that a false claim was going to be submitted to the NIH, so they could not have retaliated against Plaintiff for engaging in protected activity.  After reviewing the evidence, I conclude that the jury's verdict was not inconsistent with this Court's instructions, and there was sufficient evidence for the jury to find in favor of Plaintiff.

First, Defendants argue that the jury "could only have come to the verdict they did by ignoring Jury Instruction #7(b), which stated in full:

> If you find that Dr. Huang has proven that he was discharged, at least in part, in retaliation for engaging in protected conduct under the False Claims Act, you should find in favor of Dr. Huang, unless the defense has proven by a preponderance of the evidence that he was fired for other reasons.  If you find the defense has proven that Dr. Huang would have been terminated for reasons other than retaliation, you should find for the Defendants.  If the defense has not proven termination was for other reasons, you should find for Dr. Huang.

Essentially, Defendants contend that they presented so much evidence that Huang was fired for reasons other than engaging in conduct protected by the FCA, it was unreasonable for the jury to find otherwise.  In particular, Defendants argue that the evidence conclusively demonstrated that Plaintiff ignored performance expectations and directions from his supervisors regarding reporting his activities in the lab and how to handle the purchase of a laptop computer.  Plaintiff points to testimony in which he disputed Defendants' explanations, and argues that the jury was free to weigh the credibility of the witnesses in deciding whom to believe.

I agree with Plaintiff, and I also find that the temporal proximity between Plaintiff raising his concerns about the levels of effort assigned to the ANKK1 Grant and Dr. Li making the decision to "let him go" supports the jury's conclusion that Plaintiff was discharged "at least in part" for engaging in protected conduct. While there may have been problems with Plaintiff's performance and his ability or willingness to follow his supervisors' instructions in the past, he continued to receive positive performance evaluations, and discussion regarding letting him go does not appear to have begun until after he raised questions about improper recordkeeping concerning levels of effort. Plaintiff emailed Greg Benham, the Department's Chief Operating Officer on September 2, 2009, requesting monthly reports for the ANKK1 Grant, and informing Benham that "[i]f I cannot receive these monthly reviews promptly or if there is something wrong about them, I have to report promptly to the Department Chair, the OSP and/or the University Audit Department." Pl.'s Ex. 29, ECF No. 103-1. Benham forwarded Plaintiff's request to Dr. Li the next morning, and Dr. Li asked Benham to "please hold little bit" on giving Plaintiff the reports. *Id.* That same day, September 3, 2009, only one day after Plaintiff raised the possibility of reporting his concerns about the grant reports to the Audit Department, Dr. Li wrote back to Benham, copying Dr. Johnson, and stated "I really cannot work under this situation. It is time to do proper paper work and let him go. Too much headache for me." *Id.* The content of these emails and the short timeframe in which they were sent provide sufficient evidentiary support for the jury to conclude that Plaintiff's contract was not renewed, at least in part, because he raised his concerns about his access to and the accuracy of the grant reports. Thus, I find that the jury's verdict was not inconsistent with Jury Instruction #7(b).

Second, Defendants contend that they could not have retaliated against Plaintiff because they presented no false claims to the government, and they lacked knowledge of any records or

activity that even potentially could have led to the submission of false claims. The fundamental problem with Defendants' argument is that they continue to defend themselves as though Plaintiff had to prove that they violated the FCA. Instead, Plaintiff had to prove that they retaliated against him for engaging in conduct that was protected under § 3730(h). To be more specific, Plaintiff did not need to prove that Defendants knowingly presented to the government false or fraudulent claims or even that they knowingly made false records or statements material to a false or fraudulent claim. All he had to prove is that Defendants retaliated against him—i.e., took adverse action against him—"because of lawful acts done by [Plaintiff] . . . in furtherance of an action under this section or other efforts to stop 1 or more violations of this subchapter." 31 U.S.C. § 3730(h)(1).

Based on the evidence presented at trial and the law given to the jury in the jury instructions, I conclude that the jury acted reasonably in finding in favor of the Plaintiff. Jury Instruction #10 stated the elements of a retaliation claim. Plaintiff had to prove that: (1) he engaged in protected activity under the FCA; (2) Defendants had knowledge that he engaged in protected activity; and (3) Defendants engaged in adverse action against him in retaliation for engaging in protected activity. In support of the first element, Plaintiff testified that he believed some portion of his NIH grant funds were being allocated to individuals who were not working on the ANKK1 Grant. *See* Trial Tr. 64–73, Oct. 10, 2012, ECF No. 107. His belief was based on records regarding levels of effort assigned to employees in Dr. Li's lab. *Id.* If the levels of effort were incorrect, as Plaintiff believed them to be, then they were "false record[s] or statement[s] material to a false or fraudulent claim" because they served as the basis for documentation that would eventually be presented to the NIH.

As for the second element, while Defendants disclaim any actual or constructive knowledge regarding the making or using of false records or statements, Plaintiff did present sufficient evidence for a reasonable jury to conclude that both Defendants knew that certain records were false. Plaintiff testified that Dr. Li actually knew that the levels of effort assigned to the ANKK1 Grant were false because he knew that Nicole Gautier was not spending 50% of her time on Plaintiff's grant and that he, Dr. Li, was not spending 7.5% of his own time on the grant. *Id.* at 65:9–16. With respect to Dr. Johnson, Plaintiff testified that he told Dr. Johnson that the levels were assigned incorrectly and without his input or approval. *Id.* at 69:16–71:10. Thus, both Dr. Johnson and Dr. Li knew that Plaintiff believed that there were false records and that Plaintiff was taking action to correct such records.

The third and final element is whether Defendants engaged in adverse action against Plaintiff in retaliation for engaging in protected activity. As already discussed, Dr. Li's email strongly suggests a connection between Plaintiff's inquiries into what he believed were false levels of effort and the ultimate non-renewal of his contract. In sum, Defendants knew that Plaintiff was questioning the accuracy of the levels of effort, which ultimately would determine whether false claims would be submitted to the NIH. Plaintiff testified that Defendants knew that the levels were in fact false, in Dr. Li's case because he actually made the allegedly incorrect assignments with knowledge that neither he nor Nicole Gautier had in fact worked on the ANKK1 Grant, and in Dr. Johnson's case because Plaintiff told him that the levels were incorrect. Defendants knew, or should have known as experienced researchers who sought, received, and administered NIH grants, that claims presented to the NIH must be accurate. Thus, they knew or should have known that Plaintiff was engaging in protected activity by attempting to ensure that false records were not kept or submitted to the government. Regardless of whether

Plaintiff was right or wrong about the levels of effort and regardless of whether Defendants' actions would support an independent claim against them for violating the FCA, the evidence supports a finding that they engaged in an adverse action against Plaintiff by not renewing his contract, at least in part, because he engaged in the protected activity.

### III. Defendants' Motion for a New Trial Nisi Remittitur

Defendants have also moved for a new trial nisi remittitur, arguing that under Fourth Circuit precedent, the evidence presented at trial was insufficient as a matter of law to support the jury's award of $500,000 in compensatory damages. According to Defendants, the verdict was excessive because the only evidence presented on the issue of emotional damages came from Plaintiff's own testimony and lacked support from any medical evidence or other corroborating testimony. Therefore, Defendants request that Plaintiff either accept a reduction in compensatory damages from $500,000 to $10,000 or submit to a new trial. Because I find that the jury's award is not proportional to the actual injury suffered by Plaintiff and is inconsistent with similarly situated federal cases, I conclude that the verdict was excessive and should be remitted. Having considered the evidence in this case in light of the Fourth Circuit's guidance on remittitur, I will remit the jury award to $100,000.

"[I]f a court concludes that a jury award of compensatory damages is excessive, it may order a new trial nisi remittitur." *Sloane v. Equifax Info. Servs., LLC*, 510 F.3d 495, 502 (4th Cir. 2007). "Remittitur, which is used in connection with Fed. R. Civ. P. 59(a), is a process, dating back to 1822, by which the trial court orders a new trial unless the plaintiff accepts a reduction in an excessive jury award." *Cline*, 144 F.3d at 305 (quoting *Atlas*, 99 F.3d at 593). A jury's determination of compensatory damages is excessive and must be set aside if the verdict is against the clear weight of the evidence or based on evidence which is false. *See Sloane*, 510

F.3d at 502. The decision whether to order a new trial nisi remittitur is left to the sound discretion of the trial court. *Id.*

Defendants cite *Bennett v. Fairfax County*, 432 F. Supp. 2d 596, 602 (E.D. Va. 2006), for the principle that "the Fourth Circuit has found that verdicts, where compensatory damages were not supported by medical evidence and that were over $100,000, were excessive." Indeed, the Fourth Circuit has often found such six-figure damages awards excessive. *See Sloane*, 510 F.3d at 507 (finding a $245,000 award for emotional distress excessive and reducing damages to $150,000 and granting a new trial nisi remittitur at plaintiff's option); *Cline*, 144 F.3d at 306 (reducing an award of $117,500 to $10,000 and granting a new trial nisi remittitur); *Hetzel v. Cnty. of Prince William*, 89 F.3d 169, 172 (4th Cir. 1996) (finding a $500,000 verdict excessive).[5] Although Defendants seem to imply that the Fourth Circuit has established a bright-line rule that six-figure awards are excessive when a plaintiff has not presented medical evidence, an analysis of the cases suggests that the inquiry is very fact-specific. "Although the Fourth Circuit has ruled on a succession of cases . . . where the awards have been too high by pointing to some factors that might be relevant to a court's analysis, the Circuit has failed to enumerate any specific formula to provide the districts courts more guidance." *Bennett*, 432 F. Supp. 2d at 606.

As a general rule, an award of "substantial compensatory damages must be proportional to the actual injury incurred." *Hetzel*, 89 F.3d at 173 (quoting *Piver v. Pender Cnty. Bd. of Educ.*, 835 F.2d 1076, 1082 (4th Cir. 1987)). While the Fourth Circuit has repeatedly emphasized that a plaintiff's testimony alone can, in theory, support a large damages award, *see, e.g.*, *Price v. City of Charlotte, N.C.*, 93 F.3d 1241, 1256 (4th Cir. 1996), it has usually found

---

[5] After rather protracted litigation, the award in *Hetzel* was eventually reduced to $15,000. *See Hetzel v. Cnty. Of Prince William*, 188 F.3d 502 (4th Cir. 1999) (per curiam).

that the evidence in a given case did not support the jury's award.  Moreover, although

compensatory damages for emotional distress can be based exclusively on a plaintiff's

testimony, the plaintiff must "reasonably and sufficiently explain the circumstances of the injury

and not resort to mere conclusory statements."  *Sloane*, 510 F.3d at 503 (quoting *Price*, 93 F.3d

at 1256).  In *Knussman v. Maryland*, 272 F.3d 625, 640 (4th Cir. 2001), the court stated:

> In determining whether an award of damages for emotional distress for a
> constitutional deprivation is excessive, an appellate court may look to a number of
> factors: medical attention resulting from the emotional duress; psychiatric or
> psychological treatment; the degree of such mental distress; the factual context in
> which the emotional distress developed; evidence corroborating the testimony of
> the plaintiff; the nexus between the conduct of the defendant and the emotional
> distress; mitigating circumstances, if any; physical injuries suffered as a result of
> emotional distress; and loss of income, if any.

*Cf. Sloane*, 510 F.3d at 503–04 (applying the *Knussman* factors in a context that did not involve

a deprivation of constitutional rights).  Significantly, emotional distress associated with

litigation, as opposed to issues relating to the underlying complaint, is not compensable.  *See*

*Knussman*, 272 F.3d at 642 ("Generally speaking, litigation-induced emotional distress is never a

compensable element of damages."); *Hetzel*, 89 F.3d at 171 (stating, in the context of a plaintiff

who cried during trial, that "[q]uite obviously, a litigant's demeanor while at counsel's table is

not evidence to support a damage award").

In *Hetzel*, 89 F.3d at 170, a jury found for the plaintiff on a retaliation claim against her

employer.  The plaintiff testified that she suffered headaches, had trouble reading to her

daughter, and encountered problems with her family life after the retaliation took place, but she

nevertheless continued in her job and received a performance evaluation characterized by the

court as "nothing short of stellar."  *Id.* at 171.  In deciding that the award was "outrageous," the

court cited other cases with high awards and noted that they all "involved plaintiffs that either

were the victims of invidious discrimination, suffered serious—often permanent—physical

injuries, or were discharged and had difficulty finding alternative employment." *Id.* at 172. The court distinguished larger awards in *Meyers v. City of Cincinnati*, 14 F.3d 1115, 1119 (6th Cir. 1994), and *Wulf v. City of Wichita*, 883 F.2d 843, 874–75 (10th Cir. 1989), emphasizing that the plaintiffs in those cases had been unlawfully terminated. *See Hetzel,* 89 F.3d at 172.

In *Price*, the court held that the plaintiffs "never offered evidence of any need for medicine; physical symptoms; psychological disturbance or counseling; loss of income or pecuniary expense; a description of their emotional distress; or how their conduct changed or if others observed their conduct change." 93 F.3d at 1255 (citations omitted). Similarly, the court in *Cline*, 144 F.3d at 305–06, found that although the plaintiff "suffered some degree of emotional trauma and anxiety," there was no evidence that it persisted over time, interfered with plaintiff's ability to work or cope with a medical condition, that plaintiff required counseling or medication, or that he suffered any physical symptoms of stress. By contrast, in *Bryant v. Aiken Regional Medical Centers Inc.*, 333 F.3d 536, 547 (4th Cir. 2003), the Fourth Circuit affirmed an award of $50,000 in compensatory damages for emotional distress. At trial, the plaintiff in *Bryant* "explained that she was 'embarrassed, frustrated, and angry,' 'very disgusted,' and that she 'didn't feel very good about coming to work.'" *Id.* The court found that her testimony about her physical ailments should not be discounted simply because she did not seek medical attention and chose instead to address her problems through "prayer and faith." *Id.*

The Fourth Circuit also conducted a detailed inquiry into the evidence supporting the damages award in *Sloane*. 510 F.3d at 503–07. The court found it significant that the plaintiff "offered considerable objective verification of her emotional distress, chronic anxiety, and frustration." *Id.* at 503. She also "offered 'sufficiently articulated' descriptions of her protracted anxiety through detailed testimony of specific events and the humiliation and anger she

experienced as a result of each occurrence," as well as evidence that her distress was apparent to others, including family members. *Id.* The court distinguished *Hetzel*, *Price*, and *Cline*, finding that the plaintiffs' distress in those cases did not persist over time or affect their abilities to do their jobs. *Id.* at 504. Moreover, "the plaintiffs in th[o]se cases relied almost exclusively on conclusory testimony." *Id.* Despite the relatively substantial evidence, the court still found the jury's award was excessive, and remitted it to $150,000. *Id.* at 507.

After considering the Fourth Circuit's decisions in this area (with the exception of *Sloane*, which had not yet been decided), the district court in *Bennett* found that a jury award of $540,000 in an employment discrimination case was excessive. 432 F. Supp. 2d at 604. After remitting the damages award to Title VII's statutory maximum of $300,000, the court further remitted the award to $50,000. *Id.* at 605. The evidence in the case showed that after not receiving a promotion, the plaintiff had to leave his job, and that "he suffered chronic headaches, insomnia, and irritable stomach problems." *Id.* at 606. In explaining its decision to reduce the damages award, the court emphasized that the plaintiff did not seek medical treatment. *Id.* Ultimately, the court found that the evidence supported an award of $50,000, an amount equal to ten times the amount of back pay sought by the plaintiff. *Id.*

The results in these cases demonstrate that the jury's award of $500,000 to Plaintiff in this case is plainly excessive and must be remitted. The Fourth Circuit has clearly indicated that past awards should serve as guidelines for the trial judge to consider when deciding whether to grant a new trial nisi remittitur. *See Hetzel*, 89 F.3d at 173 (instructing the district court to "closely examine the awards [in two other cases], which we believe are comparable to what would be an appropriate award in this case."). In *Sloane* and *Hetzel*, the Fourth Circuit significantly reduced six-figure judgments, and the district court in *Bennett* did the same. As

noted, *Hetzel*, *Price*, and *Cline* all ultimately resulted in awards no greater than $15,000, while the district court in *Bennett* reduced the jury award to $50,000.  Even in *Sloane*, 510 F.3d at 503, where the plaintiff presented what the court called "considerable objective verification of her emotional distress," the court reduced the emotional distress award from $245,000 to $150,000. *Id.* at 507.  A comparison of these numbers alone suggest that the jury's verdict in this case is excessive.

Apart from the numbers, a court deciding whether a verdict is excessive must focus on whether the award of damages is proportional to the injury suffered.  The facts in this case are not so dramatically egregious that an award more than three times the largest award approved by the Fourth Circuit in similar types of cases would be appropriate.  Although I cannot find that the jury's verdict was based on evidence which is false, I do find that the specific amount of compensatory damages awarded was against the weight of the evidence.  Plaintiff did not present any medical evidence of his emotional distress, nor did he testify that he ever sought any medical attention or psychiatric or psychological treatment.  The only evidence relating to compensatory damages presented to the jury by either side came from Plaintiff's own testimony.

That being said, I conclude that the evidence Plaintiff did present supports a substantial award of compensatory damages for emotional distress.  In reaching this conclusion, I find it helpful to use the *Knussman* factors as a guide to show what evidence of emotional distress Plaintiff offered, and then to compare the evidence to that set forth in the cases discussed above. Plaintiff presented substantial evidence to explain the factual context that gave rise to his emotional distress and to demonstrate the nexus between his distress and Defendants' conduct. The  ANKK1 Grant was the first NIH grant for which Plaintiff was the PI, and securing the grant was indisputably a major personal and professional accomplishment for him.  Trial Tr. 38:17–24,

Oct. 10, 2012, ECF No. 107. Plaintiff presented evidence, and the jury found, that Defendants retaliated against him for raising questions about the proper allocation of grant funds. This retaliation took the form of the non-renewal of Plaintiff's contract, which ended his academic career at UVa and ultimately resulted in the failure of the ANKK1 Grant, causing significant emotional distress to Plaintiff. *See id.* at 103:22–104:11. He also testified that the retaliation damaged his ability to receive NIH grants in the future, *id.*, which would greatly limit his career options, a conclusion supported by the fact that he expended significant time and effort looking for a new job but failed to receive any interviews. *Id.* at 91:17–22. The presentation of these facts established a foundation for the jury, as the finder of fact, to conclude that Plaintiff suffered substantial emotional distress.

In addition, Plaintiff presented evidence as to the specific kind and degree of the physical and mental distress that he suffered. He testified that he lost fifty pounds and that his sleep pattern was disrupted. *Id.* at 106:18–107:3. Defendants attempt to argue that Plaintiff did not present any evidence on this point, but he testified as to facts of which he had personal knowledge, and his testimony was unimpeached and uncontradicted by any evidence presented by the Defendants.[6] Plaintiff also sufficiently articulated the mental distress he suffered. He testified that losing his position at UVa put strain on his marriage because his wife had to find a job to support him. *Id.* at 92:4–6. These specific examples, considered in the broader context of the termination of his position at UVa, the failure of the ANKK1 Grant, and the impact of the retaliation on his career prospects and job search, provide a solid basis for a significant award of compensatory damages.

---

[6] As I noted at trial in response to Defendants' objection to Plaintiff's testimony regarding weight loss and loss of sleep, Plaintiff was free to tell the jury the facts, and the jury as the finder of fact could decide whether Defendants' retaliation caused the physical and mental distress he suffered. *See* Trial Tr. 106:7–13, Oct. 10, 2012, ECF No. 107.

The only issue remaining is how to determine what amount of damages is appropriate and proportional to the amount of harm suffered.  In *Sloane*, 510 F.3d at 503, the defendant seeking remittitur proposed a reduction in damages from $245,000 to $25,000, but admitted that it "could offer no legal or factual basis for this amount, conceding that the number had been taken 'out of the air.'"  The Fourth Circuit commented that "[n]ot only is such an unprincipled approach intrinsically unsound, but it also directly contravenes the Seventh Amendment, which precludes an appellate court from replacing an award of compensatory damages with one of the court's own choosing."  *Id.*  Defendants in this case propose remitting the jury award to $10,000, but I find that their proposed remittitur does not adequately compensate Plaintiff for the amount of emotional distress he suffered.

As noted, the Fourth Circuit appears to favor a comparative approach whereby a court deciding a motion for remittitur should look to the evidence presented and awards made in similar cases.[7]  Plaintiff was discharged and has clearly had difficulty finding alternative employment, a factor that the *Hetzel* court found could support a relatively large award of damages.  *See* 89 F.3d at 172.  And like the plaintiffs in *Meyers* and *Wulf*, Plaintiff was unlawfully terminated, a factor that the Fourth Circuit has indicated would support a larger award.  *See id.*  Unlike the plaintiff in *Price*, Plaintiff offered evidence of physical symptoms, loss of income, and how his conduct changed.   And as the Fourth Circuit noted in *Bryant*, 333 F.3d at 547, a plaintiff's testimony about physical ailments should not be discounted simply because he did not seek medical attention.  However, Plaintiff did not present the type of objective verification presented by the plaintiff in *Sloane*.  Using these cases as guideposts, and having considered all of the evidence presented at trial, I conclude that the jury's award should

---

[7] The court in *Bennett* adopted a kind of hybrid approach, taking the plaintiff's actual injury—$5,000 in back pay—and multiplying it by 10 to reach a $50,000 award for emotional damages, which the court then compared to amounts awarded in "similarly situated federal cases involving remittitur."  *See Bennett*, 432 F. Supp. 2d at 606–07.

be remitted to $100,000.  A $100,000 award of compensatory damages is not disproportionate to the damages award for back pay, and would adequately compensate Plaintiff for the emotional harm he suffered.

## IV. Plaintiff's Motion for an Award of Front Pay

Plaintiff has brought a claim against Dr. Li and Dr. Johnson in their official capacities for prospective relief, and has moved for an award of front pay.  Plaintiff contends that front pay is a permitted form of equitable relief under the FCA and that an award of front pay is appropriate in this case, since the parties agree that reinstatement does not appear to be a viable option.[8] Plaintiff argues that the evidence presented at trial supports an award of $639,483 in front pay damages.

Under the FCA, a wronged "employee, contractor, or agent shall be entitled to all relief necessary to make that employee, contractor or agent whole . . . ."  31 U.S.C. § 3730(h)(1). Though front pay is not an enumerated remedy under the FCA, courts have recognized front pay as an available form of equitable relief under the statute.  *See Wilkins v. St. Louis Hous. Auth.*, 198 F. Supp. 2d 1080, 1091 (E.D. Mo. 2001) ("While the FCA does not specifically include front pay as a remedy available to the court to effect full compensation, the court concludes that Congress intended that front pay be awarded in the appropriate case to effect the express Congressional intention that a claimant under § 3730(h) be made whole.") (internal citation omitted), *aff'd*, 314 F.3d 927 (8th Cir. 2002); *see also McKenna v. Senior Life Mgmt., Inc.*, 429 F. Supp. 2d 695, 699 n.5 (S.D.N.Y. 2006) ("Damages for emotional distress, as well as an award for future earnings in place of reinstatement, have been permitted under the [FCA's] statutory provision for 'special damages.'") (citations omitted); *Thompson v. Quorum Health Resources,*

---

[8] In his reply to Defendants' brief opposing an award of front pay, Plaintiff stated that "all parties agree that reinstatement is not practicable (indeed it is nearly impossible)."

*LLC*, 485 F. App'x 783, 788, 2012 WL 2368871, at *5 (6th Cir. June 22, 2012) (noting successful plaintiff's award under FCA included back pay, front pay, and pain and suffering damages).

In the Fourth Circuit, whether or not to award front pay is a matter for the court, sitting in equity, to decide. *See Duke v. Uniroyal Inc.*, 928 F.2d 1413, 1424 (4th Cir. 1991). As discussed in *Duke*, front pay, as an equitable remedy, is typically used as an alternative or adjunct to reinstatement: "While reinstatement, which is clearly an equitable remedy, is the much preferred remedy, front pay may serve as a substitute or a complement." *Duke*, 928 F.2d at 1424 (discussing front pay as an equitable remedy under the ADEA); *see also Cline*, 144 F.3d at 307 (FMLA case); *Nichols v. Ashland Hosp. Corp.*, 251 F.3d 496, 504 (4th Cir. 2001) (FMLA case).

In this case, while the parties now agree that reinstatement is not practicable (and perhaps impossible), the potential alternative of front pay is barred by the Eleventh Amendment.[9] The Fourth Circuit has noted that "damages may be awarded against a defendant in his official capacity only if they would be recoverable against the governmental entity itself." *Hughes v. Blankenship*, 672 F.2d 403, 406 (4th Cir. 1982) (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978)). Dr. Li and Dr. Johnson are, in their official capacities, synonymous with UVa. *See Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989) ("[A] suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office.") (citation omitted). And it is well established that UVa is a state instrumentality entitled to Eleventh Amendment immunity. *See, e.g.*, *Tigrett*, 97 F. Supp. 2d at 756 (citations omitted).

---

[9] The Eleventh Amendment does not bar Plaintiff's entire suit against the individual Defendants in their official capacities, to the extent that Plaintiff also sought prospective injunctive relief in his amended complaint. *See, e.g.*, *Tigrett v. Rector and Visitors of the Univ. of Va.*, 97 F. Supp. 2d 752, 756 (W.D. Va. 2000); *see also Quern v. Jordan*, 440 U.S. 332, 337 (1979); *Ex parte Young*, 209 U.S. 123 (1908).

Thus, imposing a front pay award against these Defendants would impose an impermissible monetary liability on the state.

To illustrate this point, in *Campbell v. Arkansas Department of Correction*, 155 F.3d 950 (8th Cir. 1998), the Eighth Circuit held that the Eleventh Amendment barred a successful § 1983 plaintiff from collecting front pay from state Department of Correction officials in their official capacities. The court ruled that "[f]or purposes of the eleventh amendment . . . front pay is not analogous to the prospective relief permitted under *Ex parte Young* because it 'must be paid from public funds in the state treasury.'" *Campbell*, 155 F.3d at 962 (quoting *Edelman v. Jordan*, 415 U.S. 651, 663 (1974)). Similarly, in *Malkan*, 2012 WL 4722688, at *8, which addressed a wrongful termination case brought by a former professor against the dean and a faculty chair of a public law school, the court held that "front pay is unavailable as an alternative to reinstatement in an official-capacity suit against a state official where it will be paid from a state treasury."[10]

Plaintiff's allegations in this case target past conduct, and the front pay remedy he seeks is not intended to halt a present or continuing violation of federal law. *See Blanciak v. Allegheny Ludlum Corp.*, 77 F.3d 690, 698 (3d Cir. 1996) ("[F]ront pay relief [under these circumstances] would provide nothing more than compensatory damages which would be paid from the Commonwealth's coffers."); *see also Green v. Mansour*, 474 U.S. 64, 68 (1985) ("[C]ompensatory or deterrence interests are insufficient to overcome the dictates of the Eleventh Amendment."). Because Plaintiff's request for front pay against Defendants in their official

---

[10] *See also Freeman v. Mich. Dep't of State*, 808 F.2d 1174, 1179 (6th Cir. 1987) ("The plaintiff sought back pay, front pay and fringe benefits, all of which are barred by the Eleventh Amendment . . . since any payment of these claims would come from the state treasury."). While the vulnerability of the state treasury has been recognized as "the most salient factor in Eleventh Amendment determinations," *Hess v. Port Auth. Trans-Hudson Corp.*, 513 U.S. 30, 48 (1994), it is worth noting that in *Regents of the University of California v. Doe*, 519 U.S. 425 (1997), a unanimous Court held that the fact that a judgment against a state university would be covered by the voluntary indemnification agreement of a third party did not alter the Eleventh Amendment immunity enjoyed by the university, because the state still bore the legal "risk of an adverse judgment." 519 U.S. at 431.

capacities is not the sort of prospective relief permitted under *Ex parte Young*, it is barred by the Eleventh Amendment.

## IV. Conclusion

For the foregoing reasons, I will deny Defendants' motion for judgment as a matter of law, grant Defendants' motion for a new trial nisi remittitur, and deny Plaintiff's motion for front pay. The jury's award of compensatory damages will be remitted to $100,000, and Plaintiff will have the option of accepting the reduced award or proceeding to a new trial. An appropriate order accompanies this memorandum opinion.

The Clerk of the Court is hereby directed to send a certified copy of this memorandum opinion and the accompanying order to all counsel of record.

Entered this __7th__ day of March, 2013.

NORMAN K. MOON
UNITED STATES DISTRICT JUDGE